**UNITED STATES of America**

v.

**Wilbert S. BRODIE.**

**Crim. No. 87–0492.**

United States District Court,
District of Columbia.

May 19, 1988.

Jay B. Stephens, U.S. Atty., Douglas Letter, Thomas Millet, U.S. Dept. of Justice, William R. Martin, Asst. U.S. Atty., Washington, D.C., for the Government.

Gregory Bruce English, English & Smith, Alexandria, Va., for defendant.

John R. Steer, General Counsel, Donald A. Purdy, Jr., Deputy General Counsel, U.S. Sentencing Com'n, Washington, D.C., for U.S. Sentencing Com'n.

Patti A. Goldman, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for Public Citizen Litigation Group.

OPINION

HAROLD H. GREENE, District Judge.

Defendant was convicted on April 1, 1988 of possession of cocaine with intent to dis-

tribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii). Since the offense took place after November 1, 1987, defendant's actions are covered by Title II of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, 98 Stat. 1837, *reprinted at* 28 U.S.C. §§ 991-998 (hereinafter Sentencing Act or Act).[1] On April 15, 1988, his counsel moved to have the Act declared unconstitutional, and the Department of Justice filed an opposition on behalf of the United States. In short order thereafter, requests for participation as amicus curiae were filed by and granted to Public Citizen[2] and the United States Sentencing Commission. A hearing was held on May 12, 1988.

The issue before the Court is whether the Sentencing Act is constitutional. A number of constitutional questions have been raised—separation of powers, improper delegation of legislative authority, and denial of due process of law. As discussed below, the Court concludes that these challenges to the constitutional validity of the Act are valid.

Moreover, permeating the various grounds of unconstitutionality is the broad problem of a dissipation of accountability with respect to both sentencing policy and individual sentencing decisions. As the Act and the implementing guidelines are drafted, no one—criminal defendant, victim, and the public—can know who or what branch of government is responsible for sentences that are imposed, and there is no one who can legitimately be held accountable, politically or otherwise, for sentences that may be regarded as too lenient or too harsh. The simple and constitutionally-tested system of allocating responsibility for crafting sentencing policy to Congress and for imposing individual sentences to a particular

judge is essentially gone, replaced by a hodge-podge of contributions to sentencing from personnel from several different branches. The system thus departs from the basic principle that those who make or administer this nation's laws shall be accountable for their actions; it also departs from the Constitution's requirement for clear delineations between and among the three branches of government. Accordingly, as detailed *infra*, the Court holds the Sentencing Act to be unconstitutional.

## I

### Background

#### A. Sentencing Act

The Sentencing Act became law on October 12, 1984. Its major component was the establishment of a new body, the United States Sentencing Commission (hereinafter Commission).

The Commission is composed of seven members appointed by the President. Three of the members are federal judges,[3] chosen by the President from among six judges recommended by the Judicial Conference of the United States. All the members serve staggered six-year terms and are eligible for reappointment. The President may remove commissioners for neglect of duty, malfeasance in office, or "for other good cause shown." 28 U.S.C. § 991(a).

It is the Commission's duty to establish sentencing policies and practices, also known as guidelines. Although the guidelines must be submitted to Congress, they do not require congressional approval to take effect; Congress would have to pass a new law to prevent them from becoming binding. The Commission's "guidelines" are not advisory, as the name implies, but

---

1. By virtue of Pub.L. No. 99-217, 99 Stat. 1728 (1985), only offenses committed subsequent to November 1, 1987 are governed by the statute.

2. Public Citizen Litigation Group is the litigation arm of Public Citizen, a public interest organization which has appeared frequently in proceedings challenging the Sentencing Act, either as counsel for the defendant or as amicus curiae.

3. The judicial members at this time, Judge William W. Wilkins, Jr., of the Court of Appeals for the Fourth Circuit, Judge George MacKinnon of the Court of Appeals for the District of Columbia Circuit, and Judge Stephen Breyer of the Court of Appeals for the First Circuit, are all distinguished and highly-regarded jurists. Under the Act, they are not required to resign as judges on account of their service on the Commission.

they are binding on all federal sentencing judges. The government and the defendant have a right of appeal from a judge's sentencing decision both if there is an improper application of the guidelines and if a sentence is imposed that exceeds or falls short of the applicable guideline.

The congressional directions to the Commission are notable for their lack of detail. The Commission is told in broadest terms to ensure certainty and fairness and to end unwarranted sentencing disparities while maintaining sufficient flexibility to take into account individual circumstances. Under the statute, the guidelines are to be consistent with four purposes of punishment: deterrence, protection of the public, rehabilitation, and punishment commensurate with the seriousness of the crime, but the Congress did not indicate a preference for one purpose over another.

The statute further provides that the Commission should base its guideline system both on the characteristics of the offense and those of the offender. Although a number of factors are specified with respect to these characteristics, it has been left to the Commission to determine their relevance, if any, as well as their weight. The Commission must, however, take into account such factors as the prison population, the need to have career criminals serve maximum terms, and the relief of certain categories of first offenders from sentences of imprisonment. Finally, the Commission is given broad latitude to decide on such subjects as fines, restitution, supervised release, and probation, and it has the power under the statute to supplement and to amend its own guidelines.

### B. *Commission Guidelines*

The guidelines issued by the Commission are extremely detailed, covering over 200 pages of text. The overall method of organization of the guidelines is as follows. Within each general category of crimes (*e.g.*, Offenses Involving Criminal Enter-

prises and Racketeering), there are listed specific types of crimes or subcategories (*e.g.*, Making, Financing, or Collecting an Extortionate Extension of Credit) and base "offense levels" from 1 to 43 are mandated which translate into ascending terms of imprisonment.[4] The base offense level for a particular violation may be varied on the basis of such factors as the offender's prior criminal history,[5] the character of the victim, obstruction of justice, and perjury. Still other guidelines deal with the effect of cooperation with law enforcement and acceptance of responsibility. The Commission decided to exclude from the sentence calculations in the main such factors, previously often used by judges, as mental or physical condition, age, education, previous employment record, family ties, and drug abuse.

The sentencing range to be applied to a particular defendant is ascertained by consulting a table which lists vertically the offense level and horizontally the defendant's criminal history category. Judges must sentence within the range thus established and provide their reasons for selecting a particular sentence within that range. They may depart from the range for any reason only if the Commission failed to take the particular factor adequately into account.

### C. *Litigation*

As might be expected with respect to a law that applies to all criminal sentences imposed by the federal district courts throughout the nation, and with regard to guidelines that mandate sentences in the most minute detail, the new system has generated a great deal of controversy and litigation. A substantial number of courts have issued declarations of unconstitutionality on various grounds; a lesser number have upheld the validity of the Act.

In this Opinion, the Court will first discuss the specific claims of unconstitutional-

---

4. For example, with respect to an offender without a prior criminal history, an offense level of 10 translates into imprisonment for 6 to 12 months, an offense level of 40 into imprisonment for 292 to 365 months.

5. With respect to the criminal record, the Commission chose to be quite detailed.

944

ity asserted under the rubrics of violation of the principle of the separation of powers (Part II), improper delegation of legislative authority (Part III), and denial of due process (Part IV). The Court will then consider in Part V the lack of accountability under the Act for the criminal sentencing function.

## II

### Separation of Powers

The principle of the separation of powers exists in substantial part to keep "the three great branches of the National Government ... largely separate from one another" in order to preserve liberty.[6] As Madison said,[7] when the legislative and executive powers are joined, liberty will be in a jeopardy, and when the power of judging is joined with that of the executive, the judge might behave with the violence of an oppressor.[8] A principal complaint made on behalf of the defendant and by Public Citizen is that the Sentencing Act violates this principle. It is this claim that the Court will now explore.

### A. The Sentencing Commission May Not Constitutionally Be Made a Part of the Judicial Branch

The Act establishes the Sentencing Commission as "an independent commission in the judicial branch of the United States...." 28 U.S.C. § 991(a). In the view of this Court, the Commission is not properly a part of that branch both because of its membership and because of the functions it exercises.

### 1. Membership

The membership problem revolves around several factors. First and most obviously, the majority of the Commission's members are not judges or other judicial officers—at a minimum an unusual situation with respect to what is described in the statute as a judicial body.[9] Moreover, the Commission entirely lacks the independence that is the hallmark of federal judicial power. Unlike Article III judges, the Commission members do not serve for life; their terms are for six years. It is this limited term that gives rise to what may be the most troublesome aspect in this context: the presidential role in controlling the commission and in overseeing its operations.

All seven members of the Commission are appointed by the President, and he also chooses the chairman. The members serve for staggered terms, and it is again the President who decides who shall have which term, and whether or not he or she will be reappointed. Finally, the President, and he alone, has the power to remove members of the Commission for cause.

It is also noteworthy that two representatives of the President—the Attorney General and the Chairman of the Parole Commission—are ex officio members of the Commission. This is not an insignificant, formalistic matter: these two officials may be expected to act as the eyes and ears of the Executive Branch, and they may be expected also to use their own persuasive powers as well as the persuasive power inherent in their offices upon the members

6. *Buckley v. Valeo,* 424 U.S. 1, 120, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976).

7. Federalist No. 47.

8. It has also been observed that the separation of powers principle exists "to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility," *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983), and that the "legislature should not be able unilaterally to impose a substantial deprivation on one person." *Id.* 462 U.S. at 962, 103 S.Ct. at 2789 (Powell, J., concurring). Justice Powell has also noted that the separation of powers doctrine is violated (1) by impermissible interference by one branch

with another's performance of its constitutionally assigned function, and (2) by the assumption by one branch of a function more properly entrusted to another. *Id.* at 963, 103 S.Ct. at 2790.

9. Contrary to the assumption of the Sentencing Commission (Brief at 28), the mere fact that the Commission is placed in the Judicial Branch does not ensure that sentencing will remain primarily a judicial function. Judicial functions are exercised by judges, not by subordinates of the President, irrespective of the label that is applied to the agency that performs the particular responsibilities.

of the Commission to guide the Commission policy.[10]

The Supreme Court has remarked in several recent decisions on the vice inherent in the domination of a body which is part of one branch of government by personnel from another branch. In *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed. 2d 583 (1986), the Court held that the Comptroller General may not constitutionally perform executive functions because he is subject to removal by the Congress and hence under the potential influence of the legislative branch of government.[11] Even more directly on point with regard to the problem here, the Court stated in *United States v. Will*, 449 U.S. 200, 217–18, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980), that a "Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government."

These decisions are consistent with Madison's observation in The Federalist No. 48, that "none of [the branches of government] ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers." It is this Court's conclusion that, because of the significant presidential powers with respect to the membership of the Sentencing Commission, that body—assuming that it is a judicial body (*see infra*)—is impermissibly under the control of the Executive Branch.

### 2. Functions

Perhaps even more seriously, the functions vested in the Sentencing Commission are not the kinds of responsibilities that may validly be exercised by the Judiciary.

Under the principle of the separation of powers, each branch is required to confine itself and to be confined to responsibilities appropriate to its fundamental function. *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 201–02, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928); *Buckley v. Valeo, supra*, 424 U.S. at 120–22, 96 S.Ct. at 683; *Immigration and Naturalization Service v. Chadha, supra*, 462 U.S. at 951, 955, 103 S.Ct. at 2784, 2786. The Judicial Branch is limited to deciding "cases" or "controversies," *Muskrat v. United States*, 219 U.S. 346, 356, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911), and Congress may not impose upon Article III judges executive or administrative duties of a non-judicial character. *Buckley v. Valeo, supra*, 424 U.S. at 123, 96 S.Ct. at 684; *see also Glidden v. Zdanok*, 370 U.S. 530, 538–41, 82 S.Ct. 1459, 1466–68, 8 L.Ed.2d 671 (1962).

Extremely narrow departures from these principles have been allowed in special situations. *See Ex parte Siebold*, 100 U.S. (10 Otto) 371, 397–99, 25 L.Ed. 717 (1880) (Constitution authorizes Congress to vest appointment of inferior officers, such as election supervisors, in courts of law); *Keller v. Potomac Electric Power Co.*, 261 U.S. 428, 442–43, 43 S.Ct. 445, 448, 67 L.Ed. 731 (1923) (District of Columbia tribunal); *Hobson v. Hansen*, 265 F.Supp. 902, 906–11 (D.D.C.1967) (three-judge court) (District of Columbia tribunal); *Matter of Certain Complaints*, 783 F.2d 1488, 1503–10 (11th Cir.1986) (exploration of complaints against federal judge); *Young v. United States ex rel. Vuitton*, —— U.S. ——, 107 S.Ct. 2124, 2131–32, 95 L.Ed.2d 740 (1987) (appointment of attorneys to prosecute criminal contempt against court).

The Sentencing Act is a far cry from the situations involved in these limited, special cases. It is "indisputable" that "the authority to define and fix the punishment for crime is legislative," not judicial. *Ex parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72,

---

**10.** The persuasion is not only potential. Apparently, the Department of Justice has already attempted to persuade the Commission to impose the death penalty as part of the guidelines. *See* text to notes 39–40 at p. 954, *infra*.

**11.** The President appears to have more control over the Sentencing Commission than Congress had over the Comptroller General. That official could be removed only if the President and a majority of both Houses of Congress, or two-thirds of each House without the President, agreed that the statutory conditions had been met. Here, the President alone may decide upon removal. Furthermore, the Comptroller General was entitled to notice and hearing; Sentencing Commission members have no such statutory protection.

74, 61 L.Ed. 129 (1916). It is equally plain that the definition and the fixing of the punishment for crime is precisely what the Sentencing Commission is doing under the Act, and that it is doing so on a broad scale. As the Commission itself acknowledges, it is making "policy decisions with respect to the relative severity of offenses and the appropriate level of punishment." Revised Draft at 7.[12] It has also made decisions on such important policy issues as the status of plea bargaining; the extent to which cooperation with law enforcement authorities should be rewarded; when probation shall be allowed; under what circumstances monetary fines shall be required; the status of community service; and many more.

Judging by its work product, the Commission and its distinguished and learned members did an excellent and exhaustive job. But whether or not one agrees with the choices made by the Commission, the fact is that the Commission did make choices, literally hundreds, nay, thousands of policy choices in sentencing—a field as important to the domestic life and tranquility of the United States as any. These choices will profoundly influence such developments as society's tolerance or suppression of the drug traffic in this country, the climate of violence in some of the cities, the rise or fall of many categories of white collar crime, and others of similar import.

It is difficult to see how, consistently with the Constitution, the translation into practice of the public's wishes with regard to such subjects may simply be entrusted to a group of "wise men" who are technically a part of the Judiciary but who in actuality are responsible to no one, in the Judiciary or anywhere else. That function, it seems obvious to this Court, is one to be performed by the legislators elected by and responsible to the people, or at a minimum, by executive officials subject to the discipline of supervision by the President who is himself elected by the people. *Bowsher v. Synar, supra,* 106 S.Ct. at 3192.[13] *But see* Part II–B, *infra.*

The Supreme Court and the Court of Appeals for this Circuit have, particularly in recent years, exhibited an acute sense of the importance of the doctrine of the separation of powers. *See Bowsher v. Synar, supra; Immigaration and Naturalization Service v. Chadha, supra; In re Sealed Case,* 838 F.2d 476 (D.C.Cir.1988), *probable jurisdiction noted,* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988). Yet in none of these instances was the trespass on the functions of another branch as clear or as pervasive as it is here.[14] If the

12. For example, the Commission has decided that extortion (base offense level 18) is more reprehensible than receipt of a bribe (base offense level 8); that burglary (base offense level 12) is far more reprehensible than forgery (base offense level 6) or importing obscene matters (base offense level 6); and it has made hundreds of similar value and policy judgments with respect to federal crimes in all categories.

13. The Sentencing Commission argues that the sentencing guidelines are the equivalent of such judicial regulations as the Federal Rules of Civil Procedure which the Judiciary adopts and amends from time to time. The latter, it is said, regulate civil litigation in the federal courts, the former in a like manner regulate sentencing. There is no merit to that contention, for the obvious difference between the two sets of rules is that between rules of procedure and rules of substance.

Procedural rules are designed merely to assist in the fair, efficient, and impartial adjudication of issues. *See, e.g., Hanna v. Plummer,* 380 U.S. 460, 467–74, 85 S.Ct. 1136, 1141–45, 14 L.Ed.2d 8

(1965). Substantive provisions of law, such as the Sentencing Commission guidelines, are laden with value judgments, and have as their purpose the effectuation of certain outcomes. Indeed, Congress has mandated that the Federal Rules of Civil Procedure "shall not abridge, enlarge, or modify any substantive right...." 28 U.S.C. § 2072. With respect to the narrow scope of these Rules, *see also, Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). By contrast, a unanimous Supreme Court reiterated just last year what is obvious in any event: that sentencing guidelines are substantive in nature. *Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351 (1987).

14. In *Bowsher,* the inter-branch trespass was deemed objectionable primarily because Congress had the authority to remove the Comptroller General although it did not control that official in other respects; in *Chadha* a single House of Congress could invalidate an Executive Branch decision with respect to the deportation of an alien; and in *In re Sealed Case* a court was allowed to appoint, but not to inter-

inter-branch involvements in those cases could not pass muster, it is difficult to see how the much broader intrusion taking place here can be held to be consistent with the Constitution.

It is, finally, not without significance that the Department of Justice, speaking for the Executive Branch, has expressed its own considered opinion that the Sentencing Commission cannot constitutionally survive as a part of the Judicial Branch.[15]

This Court holds, consistently with the precedents cited above, that the Sentencing Act and the Commission's guidelines constitute an infringement by an agency of the Judicial Branch of the responsibilities of the Congress and hence a violation of the principle of the separation of powers.

B. *The Result is No Different if the Sentencing Commission is Sought to be Reassigned to the Executive Branch*

The Department of Justice contends that "this case would be straightforward, except [for the fact that] Congress designated the Commission 'an independent commission in the judicial branch ...,'" Memorandum at 3, and it suggests that the Court should simply disregard that part of the statute which places the Commission in the Judiciary and on its own assign the Commission to the Executive Branch. The Court now turns to that proffered solution.[16]

1. The Court May Not Rewrite the Act

First. The Department of Justice cites no authority for its assumption that the courts have the authority to disregard the congressional decision to place the Sentencing Commission in the Judicial Branch. Such an arrogation of authority would be

imprudent and might be invalid even if the congressional decision in that regard had been a mere oversight, a minor slip in a legislative process deeply concerned with other issues. *See Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3252, 3255, 92 L.Ed.2d 675 (1986) (courts may not rewrite statutes to avoid constitutional question). But the legislative history of the Act demonstrates that Congress made a very conscious decision to place the Commission in the Judicial Branch. To cite but one prominent example, in the section by section analysis, the Senate Committee on the Judiciary stated that "[p]lacement of the Commission in the judicial branch is based on the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S. Rep. No. 98–225, 98th Cong., 1st Sess. 159 (1983). *See also id.* at 63, 163.

Second. The Department of Justice assumes throughout its papers that placement of the Commission in the Judicial Branch was merely an exercise in labelling without "real world" consequences. In fact, it is one of the Department's key assumptions that for constitutional purposes, "the statutory designation—or 'label'—of the Commission is without any legally operative significance." Memorandum at 4. That assumption, too, is in error.

Among the consequences flowing from a unilateral rectification by the courts of what the Department of Justice regards as the Congress' unfortunate error would be (1) the application to the Commission of the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a,

fere with, a special prosecutor. The Sentencing Commission, by contrast, is assuming what in practice is the authority of the Congress with respect to the entire broad subject of criminal sentencing policy.

**15.** The Department's brief establishes at some length that the assignment of the guideline functions to the Commission as a part of the Judicial Branch raises these problems, among others: violation of the mandate of Article III of the Constitution that the judicial power of the Unit-

ed States shall be limited to cases and controversies; failure of the promulgation of sentencing guidelines to qualify as a judicial function; and the emergence of serious separation of powers problems as a consequence of authority to remove commissioners.

**16.** Public Citizen correctly observes that this "interbranch dispute is only the most poignant, if not the most ironic, example of how Congress ran afoul of separation of powers." Memorandum at 18.

and the Federal Advisory Committee Act, 5 U.S.C. App. 2, all of which govern executive but not judicial agencies; (2) the vesting in the President of the power to reduce the Commission's budget; [17] (3) the application to the Commission staff of such laws as the conflict of interest statutes, *e.g.*, 18 U.S.C. §§ 207, 208, prohibitions on discrimination, 42 U.S.C. § 2000e–16(a), and various civil service laws, 5 U.S.C. §§ 2102–03; and (4) the inability of the judge-members of the Commission to sit on any cases which involve any part of the Executive Branch. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

The Department of Justice's proposal that the courts disregard the deliberate congressional decision with respect to the placement of the Sentencing Commission in the Judicial Branch is so audacious that the courts would be acting far beyond their lawful authority were they to carry it out.[18]

### 2. Even as Rewritten, the Act Would be Invalid

If the Court were to rewrite the statute in accordance with the Justice Department request, that would surely disentangle the law from the infirmities discussed in Part II–A, *supra*, but the surgery would not achieve the Department's objective to save the statute. The plain fact is that the Act mandates such a tight amalgam of interbranch responsibilities and inter-branch personnel assignments that placement of the Sentencing Commission in the Executive Branch would raise as many constitutional problems as it would solve.

As noted above, the function of the Judicial Branch is to decide cases or controversies. Accordingly, the Supreme Court has repeatedly refused to allow Article III judges to pass on claims that would be reviewable by Executive officials or by Congress. *See, e.g., Hayburn's Case*, 2 U.S. (2 Dall) 411–13, 1 L.Ed. 436 (1851); *United States v. Ferreira*, 54 U.S. (13 How.) 39, 46–51, 14 L.Ed. 40 (1851).[19] It is settled, therefore, that executive or administrative duties of a non-judicial character may not be imposed upon Article III judges. *Buckley v. Valeo, supra*, 424 U.S. at 123, 96 S.Ct. at 684; *Glidden Co. v. Zdanok, supra*, 370 U.S. at 538–41, 82 S.Ct. at 1466–68.[20] Yet that is precisely what the Sentencing Act does. Three of the members of the seven-member Commission are required by the statute to be federal judges, and these judges, like the other commissioners, carry out what the Department of Justice regards as the Executive responsibilities of the Commission.

Although several appellate opinions support the validity of the service of judges on Executive Branch advisory committees, no case sanctions such service in positions of an operational or policy-making nature. In two Organized Crime Commission cases,[21] the Third and the Eleventh Circuits upheld the validity of the service on that commission of two federal judges out of nineteen members. In both cases, the courts made it abundantly clear, however, that, as Judge Roney stated in his concurrence in *Scaduto*, the service of the federal judges could be justified, if at all, only because the crime commission could only "advise and recommend" and that it had "no autonomous authority to impose sanctions or implement final binding action." 763 F.2d at

---

17. The budget of the Judicial Branch must be forwarded to Congress "without change." 31 U.S.C. § 1105(b).

18. It is presumably because the Department could see no other method for saving the statute that it made this proposal.

19. *Compare* the facts in the cited cases with the responsibilities of the three judges on the Sentencing Commission whose decisions are subject to being overruled at any time by the four non-judicial members and, indirectly, by the President with his power to remove members

for cause and to refuse to reappoint any or all of them with or without cause.

20. When a judge acts, he presumptively acts in a judicial capacity as defined in Article III of the Constitution. *Immigration and Naturalization Service v. Chadha, supra*, 462 U.S. at 951–52, 103 S.Ct. at 2784.

21. Application of the President's Commission on Organized Crime (*Scaduto*), 763 F.2d 1191 (11th Cir.1985); Matter of the President's Commission on Organized Crime (*Scrafo*), 783 F.2d 370 (3d Cir.1986).

1205.[22] As noted above, the powers of the Sentencing Commission are of a different character and quality entirely.[23]

The Department of Justice further argues, based upon language in *Scarfo, supra,* that the service of judges on executive agencies presents no problem as long as that service is voluntary. When that occurs, says the Department, the judge is acting as a citizen, not a judge. Aside from the fact that the cited case does not support the Department's contention,[24] the argument proves too much.

If the Department is right, there could be no valid constitutional objection to the "voluntary" service of a federal judge in addition to his active judicial service on, say, the Securities and Exchange Commission, or as National Security Advisor to the President, or as Secretary of Education. Surely the Constitution and its separation of powers doctrine do not countenance so strange a departure from traditional roles. *See Buckley v. Valeo, supra.*

The Department's argument reveals a misunderstanding of the status of judges and the need to keep them, to the fullest extent possible, from areas of public and private life that could give rise to impropriety or its appearance. If it is improper for a judge to serve as a trustee or guardian, to act as an arbitrator, or to be an officer in a business enterprise,[25] among others, it cannot be proper for him to divide his day between writing the regulations of the Federal Communications Commission in the mornings and judging the validity of regulations of the Federal Trade Commis-

sion in the afternoons, or between managing the Federal Bureau of Investigation one week and presiding over the criminal trials of defendants apprehended by federal law enforcement agencies the next.

Finally, placement of the Commission in the Executive Branch would violate separation of powers principles in yet another way. The Executive Branch is, of course, the branch of government that prosecutes criminal charges. It is not only unseemly but functionally entirely inconsistent with the philosophy underlying the doctrine of the separation of powers to combine in the same body and the same branch of government the persons who prosecute criminal defendants and the supposedly impartial commission that drafts, amends, and interprets the code that governs the equally impartial sentencing decisions of the federal judges.

### III

#### *Improper Delegation of Authority*

Another defect inherent in the Act is that it unconstitutionally delegates legislative authority to the Commission. Strictly speaking, the delegation doctrine, too, is rooted in the principle of separation of powers that underlies the three-branch system of government established by the Constitution. *Synar v. United States,* 626 F.Supp. 1374, 1383 (D.D.C.1986) (three-judge court), *aff'd sub nom., Bowsher v. Synar, supra.* However, the delegation issue has generally be considered by courts and text writers on a separate basis.

---

**22.** *See also Scarfo, supra,* 783 F.2d at 380. Judges Fay and Johnson in *Scaduto, supra,* concluded that the service on the Commission of the two federal judges violated the doctrine of the separation of powers.

**23.** There is also the problem that the service of judges on the Commission gives the appearance of loss of judicial independence. *See,* Comment, *Separation of Powers and Judicial Service on Presidential Commissions,* 53 Chi.L.Rev. 993, 1010–25 (1986). And "[d]ischarging tasks other than the deciding of cases and controversies would 'involve the judges too intimately in the process of policy and thereby weaken confidence in the disinterestedness of their judicatory functions.'" *In re Sealed Case, supra,* 838

F.2d at 512, quoting F. Frankfurter, *Advisory Opinions,* in 1 Encyclopedia of the Social Sciences 474, 478 (1930). These judges may lose at least the appearance of independence, and so may other federal judges, for the litigants before them may assume that too much deference is being given to the Commission and its prominent judge-members. *In re Sealed Case, supra,* at 516–17.

**24.** As indicated in the text to note 22, *supra,* the Court in *Scarfo* pointedly noted that the Crime Commission was only an advisory body.

**25.** *See generally,* Canon 5, Code of Judicial Conduct for United States Judges.

950

Although the Supreme Court, in several celebrated opinions, struck down various New Deal laws on delegation grounds,[26] since the 1930s and the creation of a number of the large independent regulatory agencies, attacks on the delegation of legislative authority have not found the courts to be hospitable.[27] The post-New Deal decisions upholding delegation have lost none of their vitality. The economy has become so complex and technical and scientific problems have become so unintelligible to the layman, educated or not, that regulation by executive agencies and independent commissions has become indispensable to modern government. Today's complex economic life in the United States could not receive the requisite governmental support and scrutiny that it deserves, and safety, consumer confidence, and financial stability—to name just a few important values—would be undermined if the existence of the regulatory commissions were to be struck down on improper delegation grounds. Thus, the delegation of legislative authority to Executive agencies is likely to remain with us. But the delegation at issue in this case is in a different category altogether than that which has been sustained in the past.

Here, unlike in almost all the prior instances of delegation of legislative power, the matters being delegated involve not the regulation of economic forces and factors but basic policy decisions of law enforcement, of criminal control, and of punishment. That this is a difference in quality and kind is obvious.

"The power to define criminal offenses and to prescribe the punishments ... resides wholly with the Congress." *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980); *United States v. Wiltberger*, 18 U.S. (5 Wheat) 76, 95, 5 L.Ed. 37 (1820); *see also Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958). As Justice Brennan said in his concurrence in *United States v. Robel*, 389 U.S. 258, 276, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1967), in the criminal law area, the "[f]ormulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsive in the same degree to the people."[28]

Even under standards more generally applicable to delegation questions, the present Act would probably fail to pass muster, for Congress has given to the Sentencing Commission a mandate of such vagueness that it constitutes no real direction at all. Section 991(b)(1)(B) of the Act informs the Commission that it shall

provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities ... while maintaining sufficient flexibility to permit individualized sentences when warranted....

Section 994(c) similarly lists equally vague factors to be considered by the Commission in grading the severity of offenses.[29]

**26.** *See, e.g., A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537, 55 S.Ct. 837, 846, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421–30, 55 S.Ct. 241, 248–52, 79 L.Ed. 446 (1935).

**27.** *See, e.g., American Power Co. v. SEC*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946); *Lichter v. United States*, 334 U.S. 742, 778–86, 68 S.Ct. 1294, 1313–17, 92 L.Ed. 1694 (1948).

**28.** The Sentencing Commission relies on the precedent of the Parole Commission and the parole system generally. Brief at 7–11. But the powers of the federal parole authorities stem from the President's own pardoning power, and delegation questions are therefore either not

involved at all or are substantially attenuated. Additionally, the parole guidelines are only advisory, 28 C.F.R. § 2.20(e); Congress itself decided when a prisoner will be eligible for parole and what criteria were to be used for parole decisions, 18 U.S.C. §§ 4205(a), (b), (f), 4206–07; and the authority of the parole authorities is further circumscribed by the judge's sentence.

**29.** The factors include such open-ended concepts, not otherwise detailed in any way, as the community view of the gravity of the offense, the deterrent effect a particular sentence may have on the commission of the offense by others, the public concern generated by the offense, the circumstances under which the offense was committed, the nature and degree of harm

More, Congress left it entirely to the Commission to include or exclude these factors from any or all of the guidelines.

It is therefore not surprising that all the important policy decisions have been made by the Commission: what base level to give each crime, *i.e.*, to establish the seriousness of the crime and the appropriate punishment; how much mitigation or aggravation is to be attributed to what characteristics of the offense and what incidents in the offender's life and background; to what extent reliance should be had on fines and probation; how to treat the central issue of plea bargaining; and others of a similar character.

Nor is this a situation where continuing and detailed oversight in a relatively technical and esoteric field requires an agency of experts if such oversight and regulation are to be had at all. The Congress, through its committee staff process, with the augmentation, if necessary, of experts temporarily retained for that purpose, could certainly have drafted sentencing guidelines on its own, assuming that the determination existed to face the difficult policy issues.

To put it another way, here delegation does not appear to have been the product of the traditional factors of technical difficulty and efficiency but rather of the desire to insulate the Congress from extended debate and political complaint. But the need for accountability, as discussed in Part V, *infra*, is precisely the reason why under the Constitution the kinds of decisions encompassed in the guidelines must be made by the Congress.

For the reasons stated,[30] it is the Court's conclusion that the broad delegation of legislative authority in this area of law enforcement cannot constitutionally be sustained.

## IV

### *Due Process*

Congress has the power to mandate minimum and maximum sentences, and when it exercises that power, it accepts the correlative responsibility for the deprivation of liberty which follows.[31] But when Congress leaves a wide area of discretion—as it has traditionally done—the occupation of that area of discretion is inherently judicial in nature.

Yet, as discussed above, the Act and the Commission's guidelines so restrict the court's discretion that they effectively negate it. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977); *United States v. Klein*, 80 U.S. (13 Wall) 128, 147, 20 L.Ed. 519 (1871). Defendants are in effect being sentenced not by a live judge but by a book of guidelines written by a commission sitting far away.

The most that can be said in this regard in favor of the Act—and this is an overly generous interpretation—is that the Sentencing Commission and the individual sentencing judges share the responsibility for sentencing. However, as the Supreme Court observed in *United States v. Nixon*, 418 U.S. 683, 704, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), the " 'judicial power of the United States' ... can no more be shared with the Executive Branch than the Chief Executive, for example, can share

caused by the offense, and the current incidence of the offense in the community and the nation. 28 U.S.C. § 994(c).

**30.** The Sentencing Commission suggests that "sentencing guidelines regulate the behavior of *judges* in performing the *judicial* function of imposing sentence" as distinguished from creating rights and obligations that bind the general public. For that reason, says the Commission, the function is judicial. Brief at 34.

This reasoning would apply equally to, say, the regulation of damage awards in negligence cases. Under the Commission's theory, the pre-

scription by an executive body of the amounts of damages that should be awarded by a court or jury in, for example, vehicular negligence or medical malpractice cases (depending upon the injury, the degree of fault, the amount of pain and suffering, and the like), could be sustained on the basis that only the judges and their grants of monetary awards were being regulated, not the plaintiffs (or the defendants) and their expectations. No one, surely, would uphold such a scheme on such a rationale.

**31.** The courts are, of course, obligated to apply these mandatory sentences pursuant to legislative direction.

with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." *See also Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 57–60, 87, 102 S.Ct. 2858, 2864–65, 73 L.Ed. 2d 598 (1982).

The judges of the District of Maryland who unanimously concurred in an opinion holding the Act unconstitutional stated, after referring to the separation of powers principle, that

> Of related and equal concern to this constitutional infirmity is a broader problem of due process—a concern for the fair treatment of each defendant ... When a definite sentence is not statutorily mandated, a defendant ... is constitutionally entitled to an articulated exercise of discretion by the judge before whom he appears rather than to the mechanical application of formulae adopted by non-constitutional commissioners invisible to him and to the general public.

*United States v. Bolding*, 683 F.Supp. 1003, 1005 (D.Md.1988).

Moreover, a number of the procedures prescribed by the Constitution or by the Federal Rules of Criminal Procedure in implementation of due process standards are infringed or largely rendered useless by the new Act. For example, under Rule 32 of the Criminal Rules the defendant must be afforded an opportunity to "make a statement in his own behalf and to present any information in mitigation of punishment."[32] But since the Sentencing Commission guidelines have already essentially preempted the field with respect to mitigation and aggravation, these allocutions will hereafter be hollow exercises at best.[33] Further, while the defendant's presence at sentencing is constitutionally mandated, *United States v. Huff*, 512 F.2d 66 (5th Cir.1975), if he cannot contribute anything effectively to the fashioning of the sentence, that right, too, is rendered largely nugatory. Even the rule that no one but the trial judge has the authority to impose

sentence, *Walters v. Harris*, 460 F.2d 988 (4th Cir.1972), is attenuated by the new procedures since presumably any judge could make the computations provided for under the guidelines and the slight adjustments the Commission allows.

Finally, the Sentencing Act's mechanical procedures have set aside some of the very fundamentals of sentencing. For example, Chief Justice Burger stated in *United States v. Grayson*, 438 U.S. 41, 53, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978), that "... it is proper—indeed even necessary for the rational exercise of discretion—to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision." Six years later, the Chief Justice reiterated that "[t]he sentencing court ... must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." *Wasman v. United States*, 468 U.S. 559, 563, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984). That is not what can or will occur under the new statute.

This Court agrees with the Maryland judges and, on the basis of their reasoning and the other factors discussed above, it concludes that the Sentencing Act's method of sentencing offends the principle of fair procedures and denies due process of law to defendants in criminal cases.

## V

### *Lack of Accountability*

As discussed above, a number of values sustain the constitutional principles implicated by the Sentencing Act. To recapitulate, the doctrine of the separation of powers rests on the principle, traced to Montesquieu's *Esprit des Lois*, that liberty is most effectively secured by a dispersion of governmental authority. Legislative power may not be promiscuously delegated to ex-

---

**32.** The prosecutor must be given an equivalent opportunity.

**33.** Except to the extent that they are a check on the computation by the judge and the writer of the presentence report of the various guideline points or levels.

ecutive or judicial agencies for similar reasons. And due process in criminal cases requires procedures that are applied by known decisionmakers who receive and consider information submitted by the defendant.

While some of these doctrines are at times applied in practice as defense mechanisms by the several branches against inroads from the others, that obviously is not their purpose. Dispersal of authority promotes control of government by the governed, as has been noted many times; but such dispersal also tends to promote accountability and hence responsibility. Actions taken by the Congress are the responsibility of the Senators and Representatives, as they come to know at the next following election, and the same principle applies to the President and his subordinates. As for judges, while they are not accountable to the electorate, their sense of responsibility is promoted, as discussed *infra*, by other means.

None of these disciplines can take effect, however, if it is not possible to determine, in practice, whose fingerprints are on a policy or decision, or a series of policies or decisions. As will now be seen, the Sentencing Act and the guidelines promulgated by the Sentencing Commission seriously offend against these principles of responsibility and accountability.

Prior to the enactment of the new statute, national sentencing policy was set by the Congress, an elected body which could be held accountable by the electorate for the policies it adopted. Individual sentences, on the other hand, were meted out by individual federal judges. The judges of course were not and are not accountable to the electorate, for they are not removable from office during good behavior.[34] However, their independence from outside

pressures, and the dictates of their consciences stemming from the knowledge that each grave sentencing decision is theirs alone, have in practice furnished guarantees of care, conscientiousness, and concern for justice, equivalent, in a very real sense, to electoral accountability.[35]

The Act changes all that. Sentencing is removed from the realm of crisp constitutional accountability, to be exercised by an unknown and essentially unknowable mixture of decisionmakers.

As discussed *supra*, the congressional role has been reduced to the announcement of a few broad statements that are not much more than truisms. Individual judges will still impose individual sentences but they will have little discretion beyond the operation of the computer necessary to add up the point scores provided in the Sentencing Commission's guidelines. Significantly, both the Department of Justice and the Commission agree on that point. The Department observes, correctly, that

> It is somewhat inaccurate to refer to the Commission's work as 'guidelines' since they are binding on all federal judges. Thus, the law states that the sentencing court 'shall impose a sentence of the kind, and within the range [set forth in the Commission guidelines] unless the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines ...' (brackets in original).

Memorandum at 7.

The Commission states, even more pointedly, that "unless a circumstance is present that the Commission did not adequately take into consideration ... the guidelines will set the actual sentencing range in most

---

**34.** The protections of Article III do not render the Judiciary immune from accountability. There is, in the first place, an elaborate system of review and appeals. Furthermore, decisions regarding statutes are subject to reversal by the Congress, and even in the constitutional realm political remedies (*e.g.,* constitutional amendments) do exist.

**35.** Trial court judges almost universally feel burdened by a special sense of responsibility with respect to sentencing decisions. In fact, judges typically will respond to questions about their work by stating that their most agonizing and soul-searching decisions are those that involve criminal sentencing.

cases." Brief at 21.[36] It is clear, therefore, that if the Commission has considered a particular mitigating or aggravating circumstance—and the guidelines reveal that the Commission has considered almost every conceivable factor, including some of a rather detailed and obscure nature [37]—the court is precluded from using that circumstance to depart from the presumptive sentence, either upward or downward.[38]

From what has been said, it is plain that the real sentencing decisions have already been made for most of the thousands of defendants who will appear in federal court in the years to come. Irrespective of what may happen in future trials and sentencing hearings, these decisions are what the Commission has set forth in its guidelines, commentaries, policies, and various methods of computation.

The vast power of the Commission, probably unprecedented in American legal history, is illustrated most vividly by the fact that it may have the authority—as it apparently claims—to prescribe the death penalty for various classes of criminal defendants, and that it may do so without any direction from the Congress.[39] If the Commission's view of its own power to prescribe binding guidelines with respect to this subject is correct, federal judges throughout the land may hereafter have to impose the supreme penalty as the Commission deems appropriate.[40]

Even at that, depending upon the point of view, these changes might be neither bad policy nor proof positive of unconstitutionality were it not for the additional fact of the peculiar composition of the Commission. As explained in more detail above, the membership of the Commission is drawn from several branches of government; the members work for the Commission only part time, and then only for a limited period after which they are expected to return to their permanent occupations; although three of the seven members are judges, all of them are removable by the President; and their terms of office are such that they may be expected to be periodically replaced. In short, sentencing policy—possibly the most important task of law enforcement in the judicial sphere—will be made, and in practice individual sentences will be imposed,[41] by a body located somewhere in the lacunae between the traditional branches of the United States government.

As discussed above, a number of constitutional problems are inherent in this system. But overarching all of them is the dissipation of responsibility and accountability that it entails.[42] Unlike the situation existing prior to enactment of the new sentencing law, if there should be a serious public concern about the enforcement of the criminal law and criminal sentencing in

**36.** The Commission believes that it has the authority, which it claims not to have exercised as yet, absolutely to prevent the judges from relying on a particular factor, simply by specifying that it had already adequately considered that factor. Brief at 22 note 5.

**37.** Levels or points are awarded or subtracted, for example, with respect to the offense of tampering with a public water system, depending upon whether the clean-up required a substantial public expenditure (section 2Q1.4(b)(2)); with respect to a larceny, depending upon whether it was planned or sophisticated (section 2B1.1(b)(4)); regarding a defendant's prior offense, depending upon whether the sentence was imposed by a tribal court (section 4A1.2(i)); a foreign court (section 4A1.2(h)), or a military court (other than a summary court martial) (section 4A1.2(g)).

**38.** Further to ensure tight adherence to the guidelines, both the defendant and the prosecu-

tion have the right of appeal if they deem that the guidelines have been improperly applied by the court.

**39.** The National Law Journal, March 23, 1987, p. 5.

**40.** Thus, if the Commission were to decide next year to exercise its death penalty power, defendants will be "sentenced" and executed ten, twenty, or more years later on the basis of guidelines adopted in 1989 by seven unelected commissioners drawn from different branches of government who, by the time sentence is actually pronounced, have long departed from the scene.

**41.** *See* pp. 953–54, *supra.*

**42.** The Sentencing Commission describes federal sentencing, with some satisfaction, as a "three-way sharing of responsibility." Brief at 12.

such areas as drug sales, street violence, or white collar crime, that concern could hereafter not properly and with justice be directed at anyone. Likewise, when prior to November 1, 1987 sentence was imposed on an individual such as Ivan Boesky, Patty Hearst, or G. Gordon Liddy, the public knew that a particular judge chose from a definite range of options made available to him by statute. But where does that responsibility lie post–1987?

The Congress could respond, with ample justification, that the governing rules were made not by it but by the Sentencing Commission. At the other end of the process, the individual judges, more often than not, would have to figuratively shrug their shoulders since their ability to engage in truly conscience-driven, individualized sentencing would be largely gone.[43] The answer is that the responsibility will hereafter lie with the Sentencing Commission with all of the defects respecting lack of permanency of membership described above. By the time sentence is actually imposed, the Commission members who adopted the applicable guidelines might long have returned to their permanent positions elsewhere, and the defendant, his victim, and the public, may all be rightfully frustrated by the lack of a responsible decisionmaker from a particular branch of government.

The Sentencing Commission is constituted by a mixture of individuals from several branches performing functions as to which even the Department of Justice and the

Sentencing Commission cannot agree, the former regarding them as Executive Branch responsibilities the latter as Judicial Branch functions. The result is that, in what may be the most critical field in the administration of the criminal law, all the branches are responsible and none is. That is not the way to conduct government consistently with the tripartite design of the Constitution.

## VI

### Conclusion

The principal purpose of the new sentencing law is to reduce disparity in sentencing. That is of course an important and worthwhile objective since unwarranted disparity not only detracts from the ideals of equal protection but also causes bitterness and despair, depending upon the sentence imposed, among convicts or among victims of crime.[44] Beyond that, as the Department of Justice correctly notes, in considering the question of the constitutionality of an act of Congress, the Court is presented with "the gravest and most delicate duty" that it "is called on to perform." *Fullilove v. Klutznick*, 448 U.S. 448, 472, 100 S.Ct. 2758, 2771, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J., quoting from Holmes, J., in *Blodgett v. Holden*, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927)). This is so especially because the statute involved is one that was

**43.** This analysis does not even take account of the involvement, for the first time, of the appellate courts in the sentencing process.

**44.** The Court cannot help but observe that this objective has not been achieved without cost.

For example, the Sentencing Commission guidelines permit a judge to award for a guilty plea only two positive "levels" to be subtracted from the twenty or thirty that the defendant incurs for the average serious felony. *See* section 3E1.1 of the guidelines. Indeed, the same two positive "levels" are available for the "acceptance of responsibility" at the conclusion of a trial. In view of the relatively meager and uncertain nature of the guilty plea inducement, it may be expected that such pleas will largely dry up, and many more trials will have to be held than in the past. The many evidentiary hearings required by the guidelines (*e.g.,* to re-

solve disputed factors, to determine the appropriateness of plea agreements) will place a further strain on the resources of the federal courts, and the result is likely to be either that a substantial number of additional federal judges will have to be authorized all over the nation or that criminal and civil litigation will experience a substantial slowdown or halt.

It appears to be unclear, even to the Sentencing Commission, whether prosecutors may employ charging policies to avoid the strict letter of the guidelines. *See* brief of Sentencing Commission at 20 note 3. If the prosecution does possess such a power, then the principal effect of the new law will have been simply to transfer discretion from the courts to the prosecutors, and the problem of disparity will not have been touched in any meaningful way.

956

adopted only after over a decade of effort by both Houses and both political parties.

Nevertheless, and with all the respect that is due to those in the legislative and executive branches, as well as on the Commission, who labored hard and with dedication and intelligence, the courts have the duty to strike down a law that clearly offends the Constitution just as they have the duty to respect congressional choice and judgment when it is possible to do so. This is such a law.

On this basis, the Court hereby declares unconstitutional the Sentencing Reform Act of 1984. However, like the judges of the District Court for the District of Maryland in *United States v. Bolding, supra,* and for the reasons there stated, the Court will stay the effect of its ruling until the constitutionality of the Sentencing Act has been finally decided, and it will, in the interim, sentence defendants committing offenses on or after November 1, 1987, in conformity with the provisions of that Act.