**UNITED STATES of America, Plaintiff,**

**v.**

**David K. BELGARD, Sr. and Bradley Scott Summers, Defendants.**

**Crim. Nos. 88–5–PA, 87–295–MA.**

United States District Court, D. Oregon.

June 30, 1988.

As Amended July 25, 1988.

Charles H. Turner, U.S. Atty., Baron C. Sheldahl, Asst. U.S. Atty., Portland, Or., for plaintiff.

Priscilla L. Seaborg, Asst. Federal Public Defender, Portland, Or., for defendant Summers.

Steven T. Wax, Federal Public Defender, Kenneth Lerner, Asst. Federal Public Defender, Portland, Or., for defendant Belgard.

Shaun S. McCrea, Eugene, Or., Patrick M. Birmingham, Portland, Or., for various other defendants.

David Anderson, Washington, D.C., for amicus U.S. Sentencing Com'n.

## OPINION AND ORDER

JAMES M. BURNS, District Judge.

### INTRODUCTION

Belgard was convicted by a jury of assault resulting in serious bodily injury (namely rupture of the victim's small intestine) 18 U.S.C. §§ 113(f) and 11,53. Chief Judge Owen M. Panner presided at the trial, and ordered a presentence report. Summers was indicted on two counts of unarmed bank robbery 18 U.S.C. § 2113(a); he pled guilty to one count in return for the government's promise to move for dismissal of the other at sentencing. Judge Marsh, who took the plea, also ordered a presentence report. Both presentence reports have been completed and sentencing for Belgard is set for July 5, and Summers for July 11, 1988. All of these criminal episodes took place after November 1, 1987, thus guideline sentencing ranges have been recommended to the judges who will impose sentence. Belgard's motion asserts a variety of constitutional claims seeking invalidation of the guideline sentencing scheme he faces. Summers joins those challenges, and adds one of his own, namely that Career Criminal Offender Guideline § 4B1.1 is also unconstitutional.

Chief Judge Panner, with the concurrence of the entire court, assigned to me the constitutional challenges [1] in the cases [2] arising from the Sentencing Guidelines. (Order filed May 26, 1988.) Oral argument was held June 15, 1988. For the reasons set forth, I deny all of defendant's motions.

The motions can, for convenience, be divided into two types. I will refer to the first group as the "Conventional" constitutional issues since they have been raised and ruled upon by many courts already. The second group includes all other constitutional issues; these, apparently being raised here for the first time, revolve around the role of the probation officer and various aspects of the presentence report as prepared pursuant to Rule 32 and the Guidelines. I will refer to these as "Probation Officer and Presentence Report" issues.

## I. "CONVENTIONAL" CONSTITUTIONAL CHALLENGES

Three basic issues are involved here:

a) Unlawful delegation by Congress of its legislative power to the Sentencing Commission;

b) Violation of Separation of Powers resulting from the makeup of the Sentencing Commission, the powers and duties assigned to it and the guidelines which it promulgated and which have been in effect since November 1, 1987;

c) Denial of Due Process arising from the new scheme of things under Guideline Sentencing.

### A. Unlawful Delegation

■ The unlawful delegation claim may be disposed of quickly. Only two cases (*Schechter* and *Panama Refining*) [3] have involved a *holding* by the Supreme court that Congress has exceeded its powers to delegate its legislative authority. An accurate and thorough discussion may be found in *Synar v. United States*, 626 F.Supp. 1374 (D.D.C.), aff'd sub nom. Bowsher v.

1. Some of the issues raised are not, in my view, of constitutional magnitude, and I do not here rule on them. In the case of Summers, for example, he says that the applicable guideline range is 210 to 262 months based upon an offense level of 32. In Summers' presentence report, the probation officer recommends a guideline range of 262–327 months, based on an offense level of 34. (See Transcript of Oral Argument, pp. 52–54.) The presentence report was prepared April 19, 1988. Summers contends that the lower range is called for by the January 18, 1988 amendments, in light of 18 U.S.C. § 3553(a)(4). This is a matter for Judge Marsh at the time of sentencing. Frankly, I think Summers' position is probably correct. In any event, since Summers pled guilty to only one count of bank robbery, the maximum is 20 years (240 months). Similarly, in Belgard's case, there are aspects of his challenges to the presentence report relating, for example, to tribal convictions, obstruction of justice and acceptance of responsibility that are for Judge Panner to decide. In my view, some aspects of these claims are not of a constitutional nature, and should be for Judge Panner, in any event, since he presided at Belgard's trial. For all I know, Judge Panner may, for example, decide that Belgard should get two points for acceptance of responsibility. It seems to me that such a ruling would certainly draw any constitutional sting from acceptance of responsibility guideline as applied.

2. For convenience, I will, for the most part refer to Belgard as the individual defendant, except in discussion of the specific claim asserted by defendant Summers. Summers challenges on constitutional grounds, the validity of the Criminal Career Offender Guideline § 4B1.1 in light of the circumstances of his case. Appendix A includes a listing of the names of other specified defendants (and case numbers) who have joined in the challenges asserted by the Federal Defender and his assistants. Further for convenience, I will refer to the challenges as being to the guidelines alone. Actually, Belgard's motion is specifically directed at the Sentencing Reform Act of 1984, Pub.L. 98–473, 98 Stat 1988, 28 U.S.C. § 991 *et seq* and 18 U.S.C. § 3553; the Sentencing Guidelines themselves, including amendments issued by the Sentencing Commission, one group of which became effective January 15, 1988 and another group effective as of June 15, 1988; amended Rule 32 of the Federal Rules of Criminal Procedure; and the local temporary order of this Court issued December 15, 1987.

3. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935)

*Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Nearly all of the judges who have ruled—including, by my count, all but two of those who have struck down the guidelines on either separation of powers or due process grounds or both—have rejected this claim. For substantially the reasons set forth in the opinions by Judges Brewster and Enright, I also reject the unlawful delegation claim.

### B. *Separation of Powers*

■ The separation of powers issue is much more difficult. From the beginning of these cases in San Diego in February, judges have been sharply divided.[4] The two judges who blazed the constitutional trail for the rest of us were Judges Rudi Brewster and William Enright of the Southern District of California. The first opinion, *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988) was issued by Judge Brewster on February 18, 1988. He struck down the guidelines on separation of powers ground. Only 11 days later, Judge Enright in *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988) rejected the separation of powers claim and found the guidelines valid. (Neither opinion analyzed the due process claim). These two opinions—authored by able and thoughtful judges—may profitably be consulted by the reader. They show how close [4A] this question is. For me, (as shown later in this opinion), the scales are tipped by the strong presumption of constitutionality which Supreme Court jurisprudence teaches we are to accord to acts of Congress. Simply stated, I am persuaded that

the Enright view (and that of his colleagues in various districts who have reached the same result) is the better view.

When Chief Judge Panner and my colleagues gave me my marching orders in late May, inherent in those orders was a command to hear arguments promptly and to issue a decision quickly. No one would be the gainer if I were to take the time and space to engage in a lengthy analysis of separation of powers. The last word will be by the Supreme Court, now that it has granted certiorari in *United States v. Mistretta,* 682 F.Supp. 1033 (W.D.Mo.1988).[5]

### C. *Due Process*

I now turn to the due process challenge. The earliest opinions—for example those of Judges Brewster and Enright—did not address the due process claim raised here. In later opinions, starting with Judge Ziegler in *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988), several courts which have struck down the guidelines have also found a violation of due process [6] as well as of separation of powers.

The analysis offered by these opinions which found violations seems to identify violations of both substantive and procedural due process. With no disrespect, the distinction between the two types seems somewhat blurred to me. If I am correct that the analysis is blurred, it is no doubt due, in part, to the short time between oral argument and issuance of the opinions.

Two central themes are emphasized in these rulings which uphold the due process claim:

---

**4.** At the moment, the "count" seems to be as follows: Eighty-six (86) judges have struck down the guidelines; guidelines have been upheld by fifty-nine (59) judges. By virtue of this opinion, that number is now sixty (60).

**4A.** It is perhaps less close as of today, as a result of yesterdays opinion by the Supreme Court in the "independent counsel" case, *Morrison Independent Counsel v. Olsen,* —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). The Court reversed *In re Sealed Case,* 838 F.2d 476 (CA.D.C. 1988), an opinion strongly relied upon by some judges who have struck down on the separation of powers issue.

**5.** 43 Cr L 4067 (June 15, 1988 issue); further, we are all aware that arguments were presented

to a panel of the Ninth Circuit on May 13, 1988 in the first two guidelines appeals in *Gubiensio v. Kanahele,* CA No. 88–5848 and *United States v. Chavez,* CA No. 88–5109.

**6.** In *U.S. v. Bolding,* 683 F.Supp. 1003 (D.Md. 1988), the Maryland court struck down the guidelines employing due process; In *United States v. Brodie,* 686 F.Supp. 941 (D.D.C.1988), Judge Harold Greene followed suit. On May 5, as discussed in the text, *infra,* the *en banc* court of the Central District of California by a split decision (14 to 10) struck down the guidelines based, in part, on the due process challenge.

a) Defendants have a due process right to have individual consideration—by an individual judge—of all relevant circumstances of the offense, and of themselves as offenders. The product tested here—sentencing under the new law—provides not a guideline but a strait jacket; "[A] defendant is constitutionally entitled to an articulated exercise of discretion by the judge before whom he appears rather than to the mechanical application of formulae adopted by non-constitutional commissioners invisible to him and to the general public." [*U.S. v.*] *Brodie*, [686 F.Supp. 941, 952 (D.D.C.1988)] quoting from [*U.S. v.*] *Bolding*, 683 F.Supp. [1003] at 1005 [ (D.Md.1988) ].

b) Defendants have a procedural due process right to challenge the information on which their sentence is based; employment of guidelines involves a forfeiture by them of this right.

Other courts have rejected the due process claim. Judge Mazzone in *United States v. Alves*, 688 F.Supp. 70 (D.Mass. 1988) appears to have been the first. Judge Diamond, in *United States v. Kerr*, 686 F.Supp. 1174 (W.D.Pa.1988) was next, and in the case from the Central District of California *United States v. Ortega–Lopez*, 684 F.Supp. 1506 (C.D.Ca.1988), Judge Hupp, writing in dissent for himself and 9 colleagues, found no due process violation. Here again, as in the opinions which have been divided as to the separation of powers issue, these are able and thoughtful opinions; they were issued—remarkably quickly—by able and thoughtful judges. Here again, aided by the strong presumption of constitutionality, I deny the due process claims asserted here, largely for the reasons stated in the opinions of Judges Mazzone, Diamond and Hupp.

■ It is true that due process plays a role in the sentence arrived at. A sentence based in part upon a prior conviction which occurred in the absence of counsel does not meet the demands of due process, *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). Nor may a judge impose a sentence based upon materially false or unreliable information, *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *United States v. Weston*, 448 F.2d 626 (9th Cir.1971), *cert denied*, 404 U.S. 1061, 92 S.Ct. 748, 30 L.Ed.2d 749 (1972). But I am not prepared to say that that is the case here with Belgard. He has every right to argue to Judge Panner, at sentencing, that information in the presentence report is of a forbidden nature or character. If Judge Panner so concludes, I am sure he will exclude it from his consideration in making a finding as to the proper guideline range, or as to whether he should depart from that range.

Further, I reject the due process arguments advanced here because they prove too much. These arguments urge adoption of a jurisprudence of labels.

I am also persuaded that those who constitutionalize "individualized sentencing" through invocation of due process have overlooked important sentencing history, especially as to flat sentencing. *See U.S. v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978).

In early years of this nation's history, the only criminal sentences were "flat". The criminal, if sentenced to prison, received a single specified term, such as five years, or perhaps a fine, where the statute so provided. As shown in section IIA of this opinion, probation as a permissible sentencing tool was simply not available as recently as 1916, when the Supreme Court ruled in *Ex Parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916). By that time, many federal criminal statutes did provide a lower and upper range of time in prison (or a fine) that could be imposed by the sentencing judge. And another decade elapsed before Congress provided the statutory authority by enacting the statute which was the forerunner of the probation scheme which has now been in place for more than half a century.

Recent years have produced—even in advance of the guidelines sentencing scheme which became effective last November 1—statutes such as 18 U.S.C. § 924(c), which provides an automatic and mandatory five-

year sentence for someone who uses or carries a weapon during the commission of certain federal felonies. Congress has also enacted laws which carry penalties of a mandatory minimum, with even much longer maximum prison sentences (which some may think are truly Draconian); these are sentences as to which neither probation nor parole may apply. See, for example, drug cases under 21 U.S.C. § 841 and Armed Career Criminal cases, under 18 U.S.C. § 924(E). These are truly "mechanical" sentencing statutes; Congress has wiped the sentencing slate clean of rehabilitation, for example, as a possible purpose for the sentencing judge to pursue. In effect, Congress has ordered sentencing judges to "throw away the key" after locking the door on the defendant. Defendants whose guilt has been established under such a statute cannot usefully present facts about themselves or their history (however sad, deprived, or abused it may be) to influence the judge's assessment of all the circumstances—either of offense or offender—so as to achieve an "appropriate" sentence. *See United States v. Alves.*

■ No court has held, so far as I am aware, that the § 924(c) sentencing scheme runs afoul of the due process clause. Indeed, it has hardly been seriously argued that a due process challenge to § 924(c) would succeed. It must not be forgotten that the task is not to determine whether the guidelines are wise, or foolish, or somewhere in between. My task is simply to determine whether they comport with the command of the Constitution. For me, though it is nearly as close as the separation of powers issue, I hold that due process is not offended by the guidelines.

No one contests that Congress, consistent with the demands of due process, can mandate a specified sentence in a given case. Surely denial of due process would be an audacious claim for a defendant to make if the Congress itself had enacted the present body of guidelines as a statute.

Further, Belgard has the opportunity to challenge each and every fact in the presentence report before Judge Panner. It must be remembered that if the probation officer has included false information and based recommended offense levels or criminal history or both thereon, the defendant has every right to so argue. It will be Judge Panner's duty to make findings and to determine the guideline range only on facts presented at the trial or on reliable information in the presentence report. This can hardly be said to be a process which is not due the defendant.

## D. *Presumption of Constitutionality*

Ruling on a constitutional challenge to an Act of Congress is the gravest duty which can confront a judge. Justice Holmes put it best when he called it "the gravest and most delicate duty that this Court is called upon to perform." *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927). It is a duty slightly less delicate when undertaken at the inferior level only because a district judge can derive a tiny bit of comfort from knowing that appeal to the Court of Appeals is a matter of right and review by the Supreme Court is almost guaranteed. While less delicate for me, it is no less grave.

■ The courts accord "great weight to the decisions of Congress". *Columbia Broadcasting Sys. Inc. v. Democratic Nat. Comm.,* 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973). One of the underpinnings of our constitutional jurisprudence comes from the court adopted rule that a strong presumption of constitutionality attends a law which has been produced by the solemn prerequisites of Congressional enactment and Presidential approval. *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981); *Fullilove v. Klutznick,* 448 U.S. 448, 472–73, 100 S.Ct. 2758, 2771–72, 65 L.Ed.2d 902 (1980). *See also, Bowen v. Kendrick,* —— U.S. ——, 108 S.Ct. 1, 97 L.Ed.2d 787 (1987) (Rehnquist, J. in chambers).

In many of the opinions I have read, this factor seems largely to have been shunted aside. If the conflict between a statute and the Constitution is clear, my duty to say so is clear also. *Columbia Broadcast-*

*ing*, 412 U.S. at 103, 93 S.Ct. at 2087. But surely I have an equivalent duty not to invalidate a statute when the balance will be tipped in favor of the statute by weighing the presumption as it should be weighed. For the reasons mentioned above, especially on the two closest issues, I find the scales tip in favor of the plaintiff, and against the defendant. Thus I deny defendant's motions.

## II. PROBATION OFFICER AND PRESENTENCE REPORT CHALLENGES

At the center of Belgard's principal claim is that he says there has been a fundamental change in the role of the probation officer. This claim boils down as follows:

1) The probation officer has now become an investigator, and before November 1 was not;

2) The probation officer has now become a fact-finder and before November 1 was not;

3) The probation officer is now required to investigate the crime charged and other criminal activity whereas before November 1, his inquiry focused on facts and history related to the offender; and

4) The probation officer has now become an advocate and before November 1 was not, and that such advocacy occurs *ex parte*, at least to some extent.

As a result, defendant says these run afoul of the doctrine of separation of powers, and further, the change in role of the probation officer and its effect on the presentence report, and therefore on the sentence which is pronounced adds up to violation of due process.

In order to analyze and evaluate this central claim, it is necessary as briefly as circumstances allow: to set forth some history of probation; to describe the probation officer's job—both before and after November 1, 1987; and to consider the type, quality, amount and characteristics of the information and insight offered to the sentencing judge in the presentence report.

### A. *History*

Probation is relatively new in the federal sentencing system. In *Ex Parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916), the Supreme Court held that federal courts did not have the authority to impose probation as an alternative to fine or imprisonment. Only the latter two were available as criminal sanctions. In 1925, Congress provided the needed statutory authority. Implementation moved somewhat slowly, but by the late 1930s and early 1940s, the use of probation began to be more widely used. With the development and gradual growth in rehabilitation as being a prime goal of sentencing through the period of the late 1940s and into the 1950s, the federal probation system also developed and grew, as did the role of the probation officer. Due to the necessity of issuance of ruling in this case, I include here only the sketchiest account. The reader is referred to three excellent articles all of which appeared in issues of the quarterly publication *Federal Probation*. These are listed in the footnote.[7]

### B. *Probation Officer's Role*

The presentence investigation and report duties of the probation officer derive from 18 U.S.C. § 3552 and Rule 32, Fed.R.Crim. P. (and, before November 1, 1987, from the predecessor Statute and Rule). The Judicial Conference of the United States, acting through its Probation Committee establishes policy for the probation system. In turn, Probation Division of the Administrative Office of the United States Courts has issued publications which flesh out those policies in detail.

For the assistance of those who read this opinion, Appendix B contains copies of the relevant portions of Publication 105 (issued by the Probation Division) as it existed before November 1, 1987; Appendix C, in

---

7. Evjen, "The Federal Probation System: The Struggle To Achieve It and Its First 25 Years", FEDERAL PROBATION, June, 1975, at 3; Meeker, "The Federal Probation System", FEDERAL PROBATION, June, 1975, at 16; Bates, "The Establishment and Early Years of the Federal Probation System", FEDERAL PROBATION, June, 1987, at 4.

turn, contains copies of the relevant portions of the revisions which were issued in September 1987 for use in guideline cases. Examination of these descriptions of the role of the probation officer before and after November 1, 1987 shows that his/her role is to investigate, and furnish a report to the court primarily as to the following matters:

a) Circumstances of the offense for which the defendant is to be sentenced, plus all other relevant offense behavior;

b) Prior criminal record, if any;

c) Harm to or loss suffered by any victim; and

d) Family history, etc. of the defendant; employment and service history; health, mental and physical, and information relative to substance use or abuse.

Investigation is unrestricted as to sources from which inquiry is made in the information gathering process. Information is then assembled into the packet called the presentence report. The probation officer furnishes not information alone, but also his or her insight into the matters covered by the presentence report. The probation officer's role includes (both before and after November 1, 1987) offering a recommendation as to the ultimate sentencing decision of the judge. The practice of disclosure or non-disclosure varies; some courts, ours for example, do not allow disclosures to either side of the recommended sentence. Other courts, or other judges in courts where practices vary among individual judges, routinely require disclosure of the recommendation. Indeed, in some courts, the District of Hawaii, for example, the presentence report did not, and perhaps still does not even contain a recommended sentence. But at the bottom, the role of the probation officer is still to gather and assemble information about the offense and the offender and to furnish it in written form to the sentencing judge.

A number of things, to be sure, have changed, as they must to carry out the guideline scheme. For example, an offense level for the charge of conviction must now be presented, as a result of the circumstances of the offense, the harm to the victim and so forth, whereas before no "number of points" was established. Prior criminal record is still assembled, but now points are assigned, and added up, to establish the category into which the defendant is placed by virtue of prior criminal history. And there are a whole host of other changes, as well, as may be seen easily by comparing Belgard's presentence report and a presentence report in an identical or similar case from a year ago. It is not surprising that such changes would be termed "revolutionary". Just such terminology is employed in an article in the most recent issue of Federal Probation. A copy is attached as Appendix D. Ironically, this issue arrived at my desk on the morning after the June 15 oral argument. It was promptly called to the attention of counsel. Those of us who toil amid the drudgery and melancholy of the sentencing vineyard as practitioners—judges, probation officers, prosecutors and defenders—are likely to use terms such as "revolutionary" in describing the changes in all of our jobs before and after November 1, 1987. Flamboyant terminology comes easily to the lips of many, perhaps most of those who do not like to change their ways.

But has the role of the probation officer changed—as defendant claims—with resulting constitutional deficiencies?

Because of time constraints, I state my view in rather a conclusory fashion:

■ The role of the probation officer—either before or after November 1, 1987—shows that while the duties and role are significantly changed, in their essentials they are still the same. It is, and has been for many years two-fold: preparation of presentence reports after adjudication of guilt; and supervision of probationers.

Under the guidelines—as under the old system—if the presentence report contains facts which defendant believes are false or unreliable, the issue is submitted to the sentencing judge for a factual finding as to reliability or lack thereof, or a determination that the information is immaterial. Under the guidelines, assignment of points

for each applicable component, offense level, acceptance of responsibility and so forth, is simply a recommendation by the probation officer to the sentencing judge. Similarly, the guideline range, and any departures therefrom (either up or down) are recommendations only. The final word is for the judge, after all have had their say. I find no due process failure in such a scheme. Merely because the actual recommended sentence—where, within the guideline range the defendant should fit, for example—is made by the probation officer to the judge alone, does not, especially in light of *United States v. Gonzales*, 765 F.2d 1393, 1398 (9th Cir.1985) *cert. denied*, 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986), persuade me that defendant has established a due process violation by virtue of the role of the probation officer, and the way in which he or she prepares and presents the presentence report to the court. In addition, I am persuaded largely by the argument by the Sentencing Commission in its Supplemental Memo at pages 4–20, which addresses the due process, separation of powers and other constitutional violations urged here by Belgard based upon the role of the probation officer. Belgard claims, also, in this portion of his argument that the upshot of guidelines is also unconstitutional in that it "violates ... the constitutionally required adversarial system" of justice (defendant's memo at 2). I reject this claim, as well. I will, as soon as circumstances allow, issue a supplemental opinion which sets forth my analysis as to this claim.

## III. ACCEPTANCE OF RESPONSIBILITY

Belgard contends that Guideline § 3E1.1 chills the exercise of the right to jury trial guaranteed by the sixth amendment and the privilege against self-incrimination guaranteed by the fifth amendment. Belgard challenges § 3E1.1 both facially and in its application.

■ Guideline § 3E1.1 provides for a reduction in the defendant's offense level if he or she "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for the offense of conviction."

I find § 3E1.1 is not constitutionally objectionable on its face. The Commentary to § 3E1.1 shows that the acceptance of responsibility guideline is not designed for the purpose of inducing involuntary incriminating statements or involuntary guilty pleas. The inclusion of § 3E1.1 marks the recognition of important societal interests on a broader scale. Besides encouraging judicial and law enforcement economy by providing a reduction in some cases where the defendant has entered a guilty plea or made admissions, the guideline recognizes societal interest in the reduction of crime, restitution, early withdrawal from criminal activity, withdrawal of criminals from positions of trust and responsibility, and the increased potential for rehabilitation among those who feel and show true remorse for their anti-social conduct.

These societal interests are reflected in the Commentary which lists examples of conduct manifesting acceptance of responsibility other than pleading guilty or incriminating oneself; and the list is not exhaustive. Thus, a guilty plea, as such, is neither a prerequisite to receiving the benefit of the reduction nor sufficient in itself to entitle a defendant to reduction.

■ It is not unconstitutional to encourage a guilty plea by providing a benefit (such as the opportunity for leniency) a defendant who in turn extends substantial benefits to society (such as those reflected in the Commentary list). *See Brady v. United States*, 397 U.S. 742, 750–53, 90 S.Ct. 1463, 1470–71, 25 L.Ed.2d 747 (1970). The courts of this Circuit have refused to invalidate as punishment for the exercise of constitutional rights, the practice of imposing stiffer sentences where defendants have not fully accepted responsibility for their action. *See, e.g., United States v. Carter*, 804 F.2d 508, 514–15 (9th Cir.1986) (Defendants' refusal to make restitution as part of a plea agreement justified stiffer sentences than those proposed in the plea bargain); *United States v. Hull*, 792 F.2d 941, 943 (9th Cir.1986) (Denial of probation because the defendant did not express re-

morse was not impermissible punishment for the exercise of her fifth amendment privilege against self-incrimination). I find these cases more to the point than those cited by Belgard.

■ Nor am I persuaded that the application note in the Commentary regarding the timeliness of a defendant's manifestation of responsibility raises defendant Belgard's objections to an unconstitutional level. The timeliness factor does not require a defendant to manifest acceptance of responsibility at the time of arrest or at any other particular time. It merely recognizes that whether the benefit to society justifies a reduction may often depend upon when the acceptance of responsibility takes place; generally the benefits of a defendant's acceptance of responsibility will be greater when it takes place earlier. The timeliness factor is a useful indicator of whether a defendant's manifestation of acceptance of responsibility is meaningful.

For the foregoing reasons, I reject Belgard's facial challenge to the acceptance of responsibility guideline. I turn to the contention that § 3E1.1 is unconstitutional as applied in this case.

Belgard was charged with unlawful and knowing assault resulting in serious bodily injury. He entered a plea of not guilty, exercising his right to a jury trial. He presented defense theories of provocation and self-defense though he declined to testify in support of his defense. He also sought and was given a self-defense instruction. The jury found him guilty.

■ The awkwardness of defendant's constitutional challenge is apparent in this factual situation. He is arguing that § 3E1.1 chills the right to jury trial, yet he has freely exercised that right. He argues that his privilege against self-incrimination is chilled, but he freely exercised the privilege when he declined to testify at trial and when he declined to discuss the espisode with his probation officer. Neither the exercise of his right to jury trial nor the exercise of his fifth amendment privilege is asserted against him in the presentence report as grounds for denial of the 2 points for acceptance of responsibility.

The probation officer's presentence investigation and assessment appears to be based on the reports of the arresting police officers and on evidence produced at trial. After conviction, Belgard chose, on advice of counsel, not to discuss the circumstances of the offense with the probation officer. It is apparent that the probation officer did not count defendant's post-conviction refusal favorably or detrimentally in evaluating the acceptance of responsibility adjustment. The probation officer briefly mentioned the fact of defendant's refusal to discuss the matter in a neutral manner, indicating neither acceptance nor denial of responsibility, apparently simply to inform the sentencing judge of the scope of his inquiry. I conclude therefrom that the fifth amendment exercise which produced refusal was simply not placed on the scales to tip the issue one way or another.[8][8a]

---

**8.** If this conclusion is, itself, disputed by the defendant because of lack of support in the record, I suggest to Judge Panner and to counsel for the government and Belgard that consideration be given to making an appropriate record at the time of sentencing.

**8a.** This footnote will serve both to correct and to clarify. At the time (June 30, 1988) the original opinion was issued, I believed, erroneously, that Belgard had testified in his own defense at the trial. This was error on my part; he *had* testified, but at a release hearing after trial. His earlier release had been revoked by Judge Panner. Thus when he sought re-release, he did testify before Judge Panner. The thrust of that testimony thus became available to Judge Panner for evaluation of Belgard's claim that he should be entitled to the 2 point reduc-

tion for acceptance of responsibility under § 3E1.1.

Thus I revise the second and third full paragraphs on page 19 of the slip opinion (lines 7–20).

[Editor's note: The change has been made in the opinion.]

My factual error seems to me to be of no consequence for two reasons. *First,* the reasoning under which Belgard's challenge to § 3E1.1 was rejected is stronger under the actual facts than under the erroneous version in the original opinion. *Second,* Judge Panner sentenced Belgard on July 5, 1988 and allowed him the two point reduction under § 3E1.1. This moots the application aspect of Belgard's challenge to that section and any factual issue relating thereto. Nonetheless, I keenly regret the error. Fiorello H. La Guardia, while Mayor of New York, once

Therefore, I conclude that defendant's fifth amendment claim cannot stem from any assertion by the probation officer that the exercise of his privilege against self incrimination should be applied to his detriment.

It is premature for me to consider whether § 3E1.1 may be unconstitutional as applied by the sentencing judge. Indeed, as with issues such as obstruction of justice and tribal criminal conviction history as grounds for departure, the decision on acceptance of responsibility is for Judge Panner alone. For all I know, he may agree with Belgard as to one or more of these aspects.

## IV. CAREER OFFENDER PROVISION

Summers challenges the constitutionality of the career offender sentencing guideline § 4B1.1. First, he challenges the creation of § 4B1.1 on the same separation of powers and impermissible delegation arguments presented in Belgard's challenge to the totality of the legislation regarding the Commission. There is no basis for holding the career offender provision to a different constitutional standard than the rest of the sentencing legislation. These arguments, as they relate to the guidelines as a whole, have been discussed at length above and in the guideline cases which I have relied on. They must be rejected as they relate to the career offender provision for the reasons set forth there.

 The career offender provision is not impermissible delegation of legislative authority. Section 994(h) of the Sentencing Reform Act provides detailed instructions as to the specific categories of crimes and offenders to be covered by the career offender guideline. It also states the effect the guideline is to have on the sentences imposed on individuals within the covered categories. Thus, the career offender pro-

vision is well within the "intelligible principle" requirement for permissible delegation of legislative power. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974); *Hampton & Co. v. U.S.*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928); and *Synar v. United States*, 626 F.Supp. at 1389.

 Nor is § 4B1.1 a new crime "legislated" by the commission in violation of the separation of powers doctrine. The crime of conviction is defined by Congress. The maximum sentence for that crime is established by Congress. The guidelines do not make it possible for the sentencing court to impose a sentence in excess of the statutory maximum set by Congress for the crime of conviction. Guidelines § 5G1.1. The career offender provision merely provides a mechanism to assure that career offenders are sentenced at or slightly below the maximum sentence established by Congress for the crime of conviction.

Next, Summers contends the Commission exceeded the authority granted by Congress by establishing a separate recidivist sentencing scheme in the career offender provision. It is true that Congress did not use the term "career offender" in stating its directives to the Commission in the Sentencing Reform Act. However, it is clear that § 994(h) contemplates severe sentencing treatment for the category of recidivist offenders who fall within the guidelines definition of "Career Offender" because they repeatedly commit certain violent and/or drug related crimes. It is difficult to envision a sentencing scheme that would more aptly effectuate the directive of § 994(h) than does § 4B1.1. Contrary to defendant's arguments, I find that the career offender section neither exceeds the authority granted in § 994(h) nor violates

said: "When I make a mistake, it's a beaut." Senator Lloyd Bentsen is said to have followed suit by saying: "When I make a mistake, it's a doozy." I join their ranks. And I assume that Mr. Youngman, who prosecuted Belgard, will not seek application to me of Section 5 of the Code of Hammurabi, which provides that:

If a judge pass judgment, render a decision, deliver a verdict, signed and sealed, and after-

wards alter his judgment which he has rendered, he shall be called to account for the alteration of the judgment, and he shall pay twelve-fold the penalty which was in the said judgment; and in the assembly, they shall expel him from his judgment seat, and he shall not return, and he shall no more take his seat with the judges in a case.

the directives contained in the rest of the Sentencing Reform Act.

■ Finally, Summers contends that Congress could not have intended to authorize the Commission to establish a status offense and that § 4B1.1 is such a status offense.

This case is nothing like the cases defendant relies on. In *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420–21, 8 L.Ed.2d 758 (1962), the Supreme Court held unconstitutional a state law which made the "status" of drug addiction a crime. The court held conviction under the law cruel and unusual punishment, where the law made being an addict a crime without the commission of any overt criminal act. In *Powell v. Texas*, 392 U.S. 514, 536, 88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254 (1968), the court upheld a state law making public drunkenness a crime against a claim that the law punished the status of alcoholism. The law was upheld because it required proof of overt criminal behavior. The court recognized the principle behind the *Robinson* interpretation of the Cruel and Unusual Punishment Clause as this:

> "[C]riminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*." 392 U.S. at 533, 88 S.Ct. at 2154.

In this case, the bank robbery for which Summers was convicted provides sufficient *"actus reus"* to justify the infliction of criminal penalties. Thus, Summers is not being sentenced for being a career offender, he is being sentenced for robbing a bank.

Although the term "career offender" suggests a status, it is actually a shorthand label for legitimate sentencing information. Congress rationally has concluded that certain individuals that have demon-

strated a past pattern of dangerous criminal conduct should be sentenced at or slightly below the statutory maximum sentence for their present crime. The career offender provision is the mechanism that effectuates that mandate. It is very similar to the enhancement provisions upheld in the cases cited by the government. *See, e.g., Rummel v. Estelle*, 445 U.S. 263, 285, 100 S.Ct. 1133, 1145, 63 L.Ed.2d 382 (1980) (upholding enhancement statute providing mandatory life sentence for third felony conviction), and very dissimilar to the status offense law struck down in *Robinson*. The career offender provision is a permissible sentence enhancement provision.[9]

To the extent defendant's reference to status offenses is intended to raise a due process/equal protection challenge, it is rejected.

In reaching this result, I also rely in substantial part on the analysis offered by Judge Diamond in *United States v. Kerr*. That opinion contained both equal protection as well as due process analysis. Kerr's claim there was a challenge to the Criminal Livelihood Guideline, § 4B1.3, as opposed to Summers' challenge as to the career offender provision.

■ Defendant's "status" as a career offender, as that term is defined in the guidelines, is not a suspect classification. Normally, legislation which does not affect a suspect class enjoys a strong presumption of constitutionality. *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979). However, where fundamental rights are at stake such as an individual's right to remain free, the courts review legislation more closely. *Williams v. Illinois*, 399 U.S. 235, 263, 90 S.Ct. 2018, 2033, 26 L.Ed.2d 586 (1970) (Harlan, J. concurring). I find that the career offender provision is not fundamentally unfair under any standard.

9. The cases challenging habitual criminal statutes on a constitutional basis, *see, e.g., Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), based upon the eighth amendment's ban on cruel and unusual punishment have not been successful. Rummel, a hapless habitual criminal, got a life sentence for

a $127 theft conviction. Due process as a ground for overturning such a mechanical sentence was not urged, perhaps because such an attack has been unsuccessful only about a decade earlier in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

The provision has the effect of imposing enhanced punishment to incapacitate for longer periods individual criminals who have demonstrated a propensity for dangerous crime. Congress rationally may conclude that individuals who have shown the pattern of dangerous criminality necessary to bring them within the career offender category are more likely to continue their dangerous criminal ways than individuals who have not. Congress rationally may conclude that the likelihood for future criminality warrants longer periods of incapacitation and that enhanced sentences for these individuals may deter recidivism in others. In conclusion, I am satisfied that the career offender provision furthers legitimate governmental purposes. It does not invidiously discriminate against Summers because of any legitimate status he holds.

## V. TRIBAL CONVICTIONS

■ Belgard contends that Guidelines § 4A1.2 and § 4A1.3(a) are unconstitutional because "they encourage the court to consider unconstitutionally obtained convictions" in arriving at the criminal history score for Belgard. (Defendant's memo, p. 20). Where reliable information not used in computing the criminal history indicates that the criminal history category does not paint an accurate picture of the defendant's past or likely future criminal conduct, § 4A1.3 authorizes the sentencing court to consider that information as grounds for departing from the otherwise applicable guideline range. Section 4A1.3(a) includes prior sentences for tribal convictions as an example of such reliable information. Similarly, § 4A1.2(i) and Commentary 6 to that section provide that tribal convictions may not be used in computing the criminal history category but authorize consideration of tribal convictions for § 4A1.3 departure purposes if the tribal convictions provide reliable evidence of past criminal activity. Belgard contends that these sections are unconstitutional because they authorize the sentencing court to rely on uncounselled convictions in a manner prohibited by *United States v. Tucker*.

The holding in *Tucker* does not compel the result Belgard seeks in the facial aspect of his challenge. In *Tucker*, the Supreme Court held that a sentencing court could not use a conviction obtained in violation of the sixth amendment right to assistance of counsel recognized in *Gideon v. Wainright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Tucker* does not stand for the proposition that reliance on tribal convictions in sentencing is unconstitutional *per se*. Belgard has not cited authority holding that all tribal convictions are *per se* unconstitutional on sixth amendment grounds. A sentencing court may have room, under § 4A1.3 and within the limitation of the *Tucker* decision, to consider prior criminal activity which resulted in tribal convictions to determine if it is reliable information and constitutionally suitable to be taken into account in sentencing. Thus facially, § 4A1.3 does not run afoul of the constitutional principles set forth in *Tucker*.

Belgard challenges § 4A1.3 as it applies to him. He objects to the use of his tribal criminal record in the presentence report and asserts that his tribal convictions resulted from proceedings in which he was not assisted by counsel. The government candidly concedes a conviction obtained in violation of *Gideon* and *Tucker* cannot be used to enhance Belgard's sentence. I do not read *Tucker* to prohibit a probation officer from using information about episodes which later led to tribal convictions in preparing his presentence report. Thus, the application aspect of Belgard's challenge assumes that Judge Panner will not properly observe the holding in *Tucker*. Respectfully, but strongly, I insist that I do not share that assumption. For all I know, Judge Panner may well believe that the presentence report reference to Belgard's criminal activity on the the reservation should play no role whatsoever in departing from the criminal history score which is not under challenge.

## VI. CONCLUSION

For the foregoing reasons, each of the arguments challenging the constitutionality of the guidelines, is rejected. Accordingly, all defendants' motions are denied.

IT IS SO ORDERED.

APPENDIX A

In the United States District Court

for the District of Oregon

CR No. 88–5 (PA)

United States of America

v.

David Keith Belgard, Sr., Defendant.

GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO
ENJOIN GUIDELINES

Attached as Exhibit A is a current list of cases pending constitutional challenges under the guidelines and their prosecutorial posture.

DATED this 15 day of June, 1988.

CHARLES H. TURNER
United States Attorney

(s) Baron C. Sheldahl
BARON C. SHELDAHL
Assistant U.S. Attorney

EXHIBIT A

| Defendant | CR Number | Judge | Defense Counsel | AUSA | Indictment Date | Status |
|---|---|---|---|---|---|---|
| CHARLES PINK | 88–60019 | Burns | Bob McCrea | Coffin | 5/4/88 | Jury trial set for 8/8/88 |
| JOHN JOSEPH CHESLEIGH | 88–60014 | Marsh | Rick Fredricks | Coffin | 3/10/88 | Jury trial set for 9/12/88 |
| JOHN DANIEL LEYBA | 88–60015 | Redden | Bob McCrea | Kent | 3/10/88 | Jury trial set for 7/11/88 |
| GARY W. TRIPP | 88–60023 | Redden | Fred Divita | Kent | 6/9/88 | Pre-trial (awaiting trial date) |
| GLORIA JEAN JACKSON | 88–60023 | Redden | Rick Fredericks | Kent | 6/9/88 | Pre-Trial (awaiting trial date) |
| MIGUEL A. OCHEACEJA | 88–68 | Burns | Walter Todd | Noonan | 1/27/88 | Awaiting sentencing |
| BRADLEY SCOTT SUMMERS | 87–295 | Marsh | Priscilla Seaborg | Sheldahl | 12/22/87 | Pled guilty 3/21/88; sentencing 7/12/88 |
| ANDY DALE MAES | 88–14 | Redden | Pat Birmingham | Youngman | 1/13/88 | Convicted 4/29/88; sentencing 6/29/88 |
| DAVID K. BELGARD | 88–5 | Panner | Ken Lerner | Youngman | 1/12/88 | Convicted 3/1/88; sentencing 7/5/88 |
| JEFF J. BAKER | 88–60014 | Marsh | Rick Fredricks | Coffin | 3/10/88 | Jury trial set 9/12/88 |
| GLEN G. MORRISON | 88–60025–1 | None | Rick Fredricks | Coffin | 5/4/88 | Jury trial set 8/9/88 |
| OWEN WALLALUTUM | 88–40 | Burns | Seaborg | Youngman | 2/17/88 | Awaiting sentencing |
| MOISES RIOS–OCHOA | 88–25–1 | Burns | H. Collins | Noonan | 1/27/88 | Awaiting sentencing |
| PAUL KEITH McCRARY | 88–139 | Panner | Erick Johansen | Youngman | 6/15/88 | Jury trial set 8/4/88 |

APPENDIX B

The Presentence Investigation Report

Introduction

In 1965 the Administrative Office of the United States Courts issued Publication 103, *The Presentence Investigation Report,* and in 1974 published No. 104, *The Selective Presentence Investigation Report.* Those documents represented the best professional judgment of what a presentence report should contain. A commit-

tee of special consultants prepared those publications under the guidance of the Judicial Conference Committee on the Administration of the Probation System. Since these earlier publications, statutory and case law have redefined the contents and the uses of the report. Publication 105 reflects the requirements of new laws. This 1984 edition includes changes brought about from the 6 years of utilization of this monograph.

*Aside from the determination of guilt or innocence, selecting an appropriate sentence is perhaps the most important decision to be made in the entire criminal justice system.* The primary vehicle to assist the sentencing court in fulfilling this responsibility is the presentence investigation report. The Federal Rules of Criminal Procedure assign the task of conducting presentence investigations to U.S. probation officers. This assignment requires a professional presentence report of the highest quality.

Functions and Objectives

This document is a guide for U.S. probation officers in the preparation of presentence reports. Its use provides a common format for presentence reports throughout the Federal judiciary. The presentence investigation report is a basic working document in judicial and correctional administration. *Its primary purpose is to aid the court in determining the appropriate sentence.* It also serves four other functions: (1) to aid the probation officer in supervision efforts during probation and parole; (2) to assist the Federal Bureau of Prisons in classification, institutional programs, and release planning; (3) to furnish the U.S. Parole Commission with information pertinent to consideration of parole; and (4) to serve as a source of information for research.

If the report is to fulfill its purpose, it must include:

 (a) All objective information that is significant to the decisionmaking process;

 (b) An assessment of the problems of the defendant and a consideration for the safety of the community; and

 (c) A sound recommendation with supporting rationale that follows logically from the probation officer's assessment.

The presentence report describes the defendant's character and personality, evaluates his or her problems, helps the reader understand the world in which the defendant lives, reveals the nature of his or her relationships with people, and discloses those factors that underlie the defendant's specific offense and conduct in general. It provides the sentencing options and a general plan to meet the defendant's problems.

Investigative Role of Probation Officer

The probation officer is responsible for searching out all pertinent facts about the defendant, verifying the information gathered, interpreting and evaluating the data, and presenting it in an organized objective report. The officer is responsible for investigating each defendant without preconception or prejudgment as to the outcome of the case.

The information should distinguish between what is factual, inferred or alleged. In most circumstances *verification by personal contact is best;* otherwise documents such as letters, facsimiles, and certified statements may be used. For obtaining specific types of information on a defendant's background, i.e., employment, education, medical, psychiatric, or financial records, an authorization form to release the information should be utilized (Appendix G(1), (2), and (3)).

*Required Content of the Presentence Report.—Rule 32(c) of the Federal Rules of Criminal Procedure is the probation officer's authorization for preparing presentence reports.* It specifies what the presentence report shall contain, i.e.,

"(A) any prior criminal record of the defendant;

"(B) a statement of the circumstances of the commission of the offense and circumstances affecting the defendant's behavior;

"(C) information concerning any harm, including financial, social, psychological,

and physical harm, done to or loss suffered by any victim of the offense; and

"(D) any other information that may aid the court in sentencing, including the restitution needs of any victim of the offense."

Rule 32 does not exclude any specific kinds of information. Case law has imposed, however, some limitations on the information contained in the presentence report.

*Body of the Report.*—Each presentence report follows the title and sequence of the core headings. If subsections are used under Personal and Family Data, they should follow the recommended sequence.

The information is reported in narrative form whenever possible. Where it does not sacrifice accuracy, the information is summarized rather than reported in detail. For example:

*Employment.* The defendant has been steadily employed as a machinist working for three different firms for the past 10 years. He has held his current job with Apex Machine Shop for 3½ years and now earns $8.85 per hour. He is considered to be a reliable honest employee by the present supervisor.

*The items listed under Essential Data are those which appear in all presentence reports.* Those listed under *Include if Pertinent* appear when the officer determines they are significant to the defendant's present situation and bear on the sentencing decision. The contents for the core categories are given below:

*Offense*

Prosecution Version

Essential Data:

Summary of the indictment or information containing number of counts, period covered, and nature, date(s) and place(s) of offense(s). Extent of property or monetary loss. In juvenile cases reasons why prosecution was not diverted to local courts. Details of the offense including a summary of the defendant's specific involvement. Role of defendant in planning and commission of crime (total offense behavior).

*Comment:* Information for the prosecution version of the offense may be obtained primarily from the office of the U.S. attorney. *It is the probation officer's responsibility to prepare all sections of the presentence report.* Lengthy statements submitted by the prosecutor or any other individual can be edited by the probation officer, but consultation with the party may be necessary to assure that the edited information is factual and accurate.

For offenses involving multiple defendants, probation officers must consult with one another on the prosecution version and include complete and consistent information regarding all defendants. For drug offenses obtain details on the net weight and purity of the drugs purchased, seized or sold. If this information is not available from the U.S. attorney, the Drug Enforcement Administration should be contacted.

*Other Sources of Information* can include the investigating agent, other law enforcement agencies involved in the investigation, and the clerk of the court's file. In this section the probation officer should include additional data not obtained from the prosecution and *any statements or evidence provided by a source which offers differing views of the offense behavior,* including firsthand statements of complainants and witnesses. *The source of this information should be clearly labeled.*

*Victim Impact Statement*

Include where there is an identifiable victim:

"Information concerning any harm, including financial and social, psychological, and physical harm done to or loss suffered by any victim of the offense; and any other information that may aid the court in sentencing, including the restitution needs of the victim," Rule 32(c), Federal Rules of Criminal Procedure, as amended by P.L. 97–291 (October 12, 1982). *All parties making such statements to a probation officer should be aware that the court must disclose all such information to the*

*defendant and the attorney for the government.*

The financial assessment can also be useful to the court in making restitution orders under P.L. 97–291 (18 U.S.C. 3579) or 18 U.S.C. 3651 (see Financial Section for details on information to be included). Note: The restitution provisions of P.L. 97–291 apply only to Title 18 and certain subsections of the Federal Aviation Act (49 U.S.C. 1472). However, under 18 U.S.C. 3651 restitution may be ordered for any offense, but *only* as a condition of probation. 18 U.S.C. 3651—"The defendant may be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense *for which conviction was had.*"

*Defendant's Version*

Essential Data:

Summary of offense and arrest by defendant. Extent to which defendant admits guilt. Defendant's explanation of why he became involved and what he hoped to accomplish. Defendant's statements regarding damage done to a victim's property, the victim's loss, or any injury suffered by a victim. Include the probation officer's assessment of any differences between the defendant's version and the prosecution version.

*Prior Record*

Juvenile Adjudications

Essential Data:

Date, charge, location, disposition, and representation by counsel of all referrals to juvenile court by law enforcement officials.

Adult Record

Essential Data:

Date of arrest, charge, location, date and disposition of all arrests, and representation by counsel.

Include if Pertinent:

Detainers and details of charges lodged against defendant. Defendant's explanation of why he was involved in previous offenses. Codefendants in previous offenses. Details of arrests occurring subsequent to present offense. For serious offenses include a summary of the offense, and prior probation, parole or institution adjustments and dates.

*Personal and Family Data*

The core category Personal and Family Data is comprised of the following subsections:

*Defendant*
Parents and Siblings
Marital
Education
Employment
Health
 Physical
 Mental and Emotional
Military Service
Financial Condition
 Assets
 Liabilities

In all cases this core category will be used to report information about the defendant's family, marriage, education, employment, health, military service, and financial condition. IF AFTER EXPLORING ALL OF THE SUBSECTIONS THE INFORMATION IS FOUND TO BE UNREMARKABLE OR ROUTINE, IT IS TO BE REPORTED IN A SINGLE NARRATIVE. Whenever information is received which indicates unusual social or personal circumstances which may have contributed to the defendant's present difficulties, report this in a separate subsection with an appropriate heading.

*Defendant*

Essential Data:

Influences of early life that may have a significant bearing on defendant's present personality and behavior. Extent of family cohesiveness, attitudes of parents, and important factors in the home and neighborhood environment. Persons who reared defendant if other than parents. Present status of this relationship. Family members with whom defendant is especially close. Age left

home, reason for leaving. Any history of running away from home. Primary factors affecting defendant's present mode of living, including relationship with family members, associates, and home and neighborhood influences. Career and social accomplishments. Any other major factor affecting defendant's present behavior.

## Marital

If defendant has never married or cohabited, omit this section.

Essential Data:

Present marriage or relationship if cohabiting. Date and place of marriage; name and age of spouse at time of marriage as well as present status of the relationship. Quality of the relationship between defendant, spouse, and children —cohesive or stressful? Previous marriage(s).

## Education

Essential Data:

Educational achievement, age left school and reason for leaving. Last grade completed and the grade or year in which presently enrolled if the defendant is attending school.

## Employment

Essential Data:

Employment stability and how this relates to present personal adjustment. Specific information about his or her employment record. Beginning with the most recent job, list the verified employment history for the past 10 years including dates, nature of work, and reasons for leaving. Employer's evaluation of defendant (immediate supervisor, where possible) including attendance, capabilities, reliability, honesty, personality, attitude toward work, and relationships with coworkers and supervisor. Occupational skills, interests, and ambitions. If unemployed, source of support. Defendant's capacity for employment. Verified employment or vocational training opportu-

nities currently available to the defendant.

*Comment:* Demonstrate how the defendant's employment adjustment and attitude toward the job relate to his or her personal and social adjustment. Verify the employment history by contact with each employer. Specify any part of the employment history that has not been verified. If the employer's evaluation differs from the defendant's, explore the discrepancies. It is important to find out why the defendant left employment. Was it a result of the instant offense? It is not necessary to report on the employment history beyond the most recent 10–year period unless there is obvious relevance to the defendant's present life. Summarize in a single statement any history of employment at a variety of menial jobs. If the offender is unemployable, describe nature of limitation or handicap.

## Health

Physical:

Essential Data:

Any physical illness(es) for which the defendant is presently being treated. Type of treatment or medication, if known. General physical condition. Health problems based on defendant's estimate, medical reports, and probation officer's observations. Urinalysis results.

Include if Pertinent:

Evidence of excessive alcohol consumption. Dependence upon drugs or alcohol to a degree that shows a noticeable mental disturbance, damage to physical health, or interference with interpersonal relations and social and economic functioning. Opiates or other drug abuse. History of serious diseases, major surgeries, and hospital treatment presently affecting defendant. History of chronic illnesses. Allergies especially to any common medicines; e.g., penicillin.

Mental and Emotional:

Essential Data:

Social adjustment and personality characteristics as assessed by associates, fami-

ly members, and mental health professionals, if any. Social and personal characteristics in relation to overall adjustment. Awareness of emotional problems and willingness to accept responsibility for seeking solutions. Ability to cope with family and social demands.

### Military Service

If the defendant has not been in military service omit this section.

Essential Data:

Branch of service. Service number. Dates of each period of military service and total length of service. Type of discharge. Highest grade or rank achieved and grade or rank at separation.

### Financial Condition *

Assets:

Essential Data:

Statement of financial assets. Average monthly income. Spending habits in relation to level of income. If unemployed, source of support such as unemployment insurance, public assistance, veteran's/military benefits, Social Security benefits, private assistance, retirement funds, family help, or criminal activities.

Include if Pertinent:

Net worth statement. Real estate (type, location, value, equity). Insurance (type, amount, cash value, company). Checking, saving, and money market accounts (bank or institution, amount). Stocks and bonds (type, value). Personal property (car, furniture, appliances). Income from pensions (e.g., IRA's, KEOGH's), rentals, boarders, and spouse's and children's income. Available resources through relatives and friends. Other property (jewelry, silver, gold, antiques), and other valuable items and collections.

Liabilities:

Essential Data:

Statement of financial obligations including balance due and monthly payments (home mortgage, taxes, rent, utilities, medical, personal property, home repairs, charge accounts, loans, fines, restitution, child support, and legal fees).

Include if Pertinent:

Money management and financial delinquencies. Credit rating.

*Comment:* This section should permit an assessment of the defendant's ability to pay a fine or restitution. Knowledge of the defendant's assets and financial obligations is a good indicator of how responsible he is. A credit report, available through local retail credit associations, may offer helpful leads to his or her financial status.

### Evaluation

Essential Data:

Probation officer's assessment of the defendant's problems, attitude, and behavior. Specifically, consider the role of parents, spouse, residence, employment, and any pertinent medical, psychiatric, or drug treatment that is indicated. Briefly set forth goals and general action steps which might achieve those goals. Include parole guideline data and sentencing data. *Include a general supervision plan to meet the defendant's problems through the services of the probation office and available resources.*

### Probation Officer's Assessment

The evaluation contains the probation officer's professional assessment of the objective material in the body of the report. It goes beyond summarizing the more significant contents, although some highlighting may be necessary to lend continuity. Having gathered all the facts, the probation officer should now consider the protection of the community and the problems of the defendant.

*Parole Guideline Data.*—Probation officers should complete the U.S. Parole Commission Tentative Guideline Worksheet. From these results, include the probation officer's *estimate* of the offender's characteristics (Salient Factor Score), offense characteristics, type of guidelines (adult or youth), and the probable months to be

spent in custody (guideline range) according to the U.S. Parole Commission guidelines for decisionmaking. Bear in mind that these are *estimates* since the Commission prepares the official computation for those defendants committed to imprisonment.

*Recommendation*

Essential Data:

The recommendation for disposition including supporting rationale and purposes of sentencing.

## APPENDIX C

Presentence Investigation Reports Under the Sentencing Reform Act of 1984

*Introduction*

The primary purpose of the presentence report is to aid the court in determining the appropriate sentence. The report also serves to aid the probation office in supervision efforts during probation and supervised release, and to assist the Federal Bureau of Prisons in classification, institutional programs, and release planning. Under the Sentencing Reform Act, the critical step in arriving at a sentence is the determination of the applicable guideline range. To determine that range, the court will be required to make findings of fact. A major purpose of the presentence report is to simplify that process for the court.

Thus, the goal of the officer preparing the presentence report must be to provide the court with solid, well researched, verifiable information that will aid the court in selecting the proper guideline range.

The informed exercise of this discretionary authority requires that the presentence report include information about the offense and the offender that may not be relevant in determining the applicable guideline.

In this context, it is crucial that probation officers continue to exercise their traditional independence as agents of the court. The probation officer cannot be intimidated by the possibility that information in the report will be challenged. While the probation officer may discuss the case with the lawyers, it is not intended that the officer withhold from the court reliable information disclosed by his or her investigation. In particular, it is not contemplated that the lawyers will, by agreement, be permitted to eliminate relevant information.

In order to advise the court of the guideline range that the probation officer believes to be applicable, as required by Rule 32(c)(2)(B) of the Federal Rules of Criminal Procedure, it will of course be necessary for the probation officer to interpret the guidelines.

In the last analysis, the officer must call the facts and the interpretive issues, as he or she sees them, even at the risk of becoming involved in controversy. The officer's independence and integrity are indispensable.

*Conducting the Investigation*

It is the responsibility of the probation officer to search out all pertinent facts about the offense and the offender, verify the information gathered, and present it in an organized, objective report.

Traditionally, probation officers have been guided in their presentence investigations by a philosophy that put a premium on understanding the causes of an offender's antisocial behavior and evaluating the possibilities of change. Under guideline sentencing, the emphasis will be very different.

As a general matter, the report of the presentence investigation should contain only information that the probation officer believes to be accurate. Every effort should be made to pin down relevant facts, particularly those upon which the guideline determination depends.

In furtherance of this objective, the format for reports under the Sentencing Reform Act does not call for a prosecution version and defense version of the offense. Rather, the report is to include a single rendition of the offense that, in *the judgment of the probation officer*, is supported by his or her investigation. This rendition will provide the basis for the officer's calculation of the offense level. Any differ-

ences that the prosecution or the defense may have with that rendition are to be raised by them in their comments on the presentence report after disclosure is made.

## PART A. THE OFFENSE

*Charge(s) and Conviction(s)*

Describe, in narrative fashion, the charge or charges in the indictment or information and the present status of the charges. For each count, include the nature of the offense charged, the date of the offense, the plea or verdict or other disposition, and the date of the disposition. Report this information for any codefendants as well as for the defendant who is the subject of the report.

*The Offense Conduct*

In this section, provide a description of the offense conduct and the consequences of that conduct to any identifiable victims or to the community.

As has been noted above, the new format does not contemplate that separate prosecution and defense versions of the offense will be presented. Rather, the probation officer is to report what happened as established by the investigation, using his or her best judgment to resolve discrepancies among sources.

The scope of the inquiry also includes information about any aggravating or mitigating factors in the commission of the offense, since the judge may wish to take such behavior into account in the sentencing process. For example, purity and street value of drugs will still be relevant indicators of the defendant's place in the chain of distribution, even though the Guidelines are based on the total weight of the mixture or compound containing the controlled substance.

In the case of an offense committed by more than one person, it is important that the statement of the offense conduct be sufficient to form the basis for a determination whether adjustments for role in the offense are appropriate. The presentence report for any one defendant should therefore discuss the roles of all participants.

Also report in this section the amount of any gain to the defendant from the offense conduct and information about the impact of the offense conduct on identifiable victims or the community. Include an assessment of the financial, social, psychological, and medical impact upon, and cost to, any individual victim.

Most of the essential offense data may be found in the U.S. attorney's file, including the nature of the charge, details of the offense, statements of arresting officers, statements of codefendants, complainants, witnesses, and victims, and a summary of the defendant's arrest record.

Other sources of information can include the investigating agent, other law enforcement agencies involved in the investigation, and the clerk of the court's file. Firsthand statements of witnesses may also be important. For offenses with identifiable victims, it will usually be necessary to interview the victim to gather information about the impact of the offense.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

In the first two sections of this part, report the defendant's juvenile adjudications of guilt and criminal convictions.

For each offense, report the date of referral or arrest, the charge, the court, the date of sentencing, and the disposition. Show the number of points that each conviction contributes to the criminal history score and the section of the Guidelines on which that number is based. Indicate whether the defendant was represented by counsel or waived his or her right to counsel. In the case of serious offenses, provide a brief description of the offense. If the defendant's sentence included a term of imprisonment, indicate when he or she was released. If it included a term of supervision, indicate whether the supervision was successfully completed; if supervision was revoked, indicate the disposition.

*Other Criminal Conduct*

If there are misdemeanor convictions that were excluded from the previous section because it could not be established that

■■■■■■■■■

the defendant was represented by counsel or waived the right to counsel, report any such convictions that *did not result in incarceration.* Indicate how the criminal history score would be changed if the conviction were counted.

## PART C. SENTENCING OPTIONS

In this section, set forth the statutory provisions and guideline provisions regarding imprisonment, probation, and supervised release. Include a determination of the guideline range, based on the offense level and criminal history category previously reported.

## PART D. OFFENDER CHARACTERISTICS

In this section, describe offender characteristics, other than the prior record, that may affect the sentence. The section should include any information that may be relevant in determining a program of supervision as well as any information that bears on the defendant's ability to pay a fine or make restitution.

In conducting the investigation, it is essential to develop a thorough understanding of the defendant's personality and motivations, as well as the extent of family and community support that can be anticipated if the defendant is in the community under supervision. In the course of the investigation, the probation officer will develop a great deal of detailed information, not all of which will be useful in support of the sentencing decision.

*Family Ties, Family Responsibilities, and Community Ties*

Present a concise statement of the defendant's family ties, family responsibilities, and community ties.

*Mental and Emotional Health*

Report any mental or emotional problems disclosed by the investigation. Mental and emotional problems are not considered in determining the guideline sentence, but are often relevant in determining the length and conditions of supervision. Information reported in this section will also be useful

to the Bureau of Prisons if the defendant should be incarcerated.

*Physical Condition, Including Drug Dependence and Alcohol Abuse*

Identify any health problems that the defendant may have. Also include any evidence of dependence upon drugs or alcohol.

*Education and Vocational Skills*

State the defendant's highest level of academic achievement and any specialized training he or she may have had or skills he or she may have acquired.

*Employment*

Provide a concise report of the defendant's employment history. If relevant, include information about the defendant's military service as well as civilian employment. Recent employment should be reported in some detail; earlier history should be summarized.

Employment history may be relevant to the determination of length and conditions of supervision. It may also be useful in determining whether the defendant is likely to be able to make restitution or pay a fine.

## PART E. FINES AND RESTITUTION

*Statutory Provisions*

Set forth the relevant statutory provisions governing fines, special assessments, and restitution.

*Guideline Provisions for Fines*

Set forth the guideline provisions about fines and any relevant policy statements. An example showing the format for reporting both statutory and guideline provisions is as follows:

*Defendant's Ability to Pay*

Report in this section detailed, verified information about the defendant's financial condition, including assets and liabilities, and income and expenditures. Include an analysis by the probation officer of the amount of restitution and/or fine that could reasonably be imposed on the defendant. The financial data should be displayed in tabular form, with references as needed to explanatory notes following the table.

## PART F. FACTORS THAT MAY WARRANT DEPARTURE

In this section, the probation officer should discuss those factors that, in his or her opinion, may warrant departure from the Guidelines. The task here is essentially analytical—to identify those characteristics of the offense or the offender that might suggest sentence outside the Guidelines, without attempting at this point to evaluate them.

## PART G. IMPACT OF PLEA AGREEMENT

This section is to be included in the report if the report will be used by the court to determine, pursuant to Rule 11(e)(2) of the Federal Rules of Criminal Procedure, whether to accept a plea agreement.

## IV. ADDENDUM TO THE PRESENTENCE REPORT

The probation officer conducts any further investigation that is necessary to resolve these objections and makes any revisions to the presentence report that the officer regards as warranted. Any objections that remain unresolved are reported to the court in the addendum in order to alert the court to those issues that the judge will have to resolve.

## V. SENTENCING RECOMMENDATION

In the sentencing recommendation, the officer should provide his or her personal judgment about the appropriate sentence.

## APPENDIX D

The Investigative Role of the United States Probation Officer under Sentencing Guidelines

By Susan Krup Grunin and Jud Watkins *

### Introduction

Guideline sentencing will bring about a revolution in the work of United States probation officers. It will profoundly affect the way presentence reports are prepared by probation officers and used by the courts in imposing sentences. Most of the investigative procedures, report format, and sentencing rules familiar to probation officers are changed as a result of guideline sentencing. This essay will provide a brief background and an example of guideline sentencing, along with a discussion of the new skills required of probation officers in preparing the presentence investigation report under guideline sentencing.

### Background

Origins of guideline sentencing can be traced to the early 1960's. Model penal codes, commissions on sentencing reform, and the American Bar Association's standards [1] relating to sentencing alternatives held a common objective: To clarify the purposes of sentencing and reduce sentencing disparity. Through the mid–1970's many state legislatures adopted various forms of determinate sentencing. Typically, these variations featured prescribed prison terms for certain felony offenses and set standard "good-time" deductions. Parole boards in these states were either abolished or lost the authority to set the release terms for prisoners.

By the end of the 1970's several states, including Minnesota, California, Florida, Maryland, Washington, and Pennsylvania, had taken yet another step toward sentencing by rule; they established standing agencies to promulgate rules, assess their impact, and develop sentencing policies for the future. Within the Federal criminal justice system, the decade of the 1970's saw congressional review of the Brown Commission's [2] recommended legislation for reforming Federal sentencing practices.

---

* The authors are both with the Probation Division, Administrative Office of the United States Courts—Ms. Krup Grunin as a regional administrator and Mr. Watkins as a probation program specialist.

1. American Bar Association, *Standards on Sentencing.*

2. *Supplemental Report on the Initial Sentencing Guidelines and Policy Statements,* U.S. Sentencing Commission, Washington, DC, June 18, 1987, p. 1.

Thereafter, a series of legislative proposals between 1973 and 1975 sought to regulate the Federal sentencing process, primarily through recodification.

The elements of sentencing guidelines and a sentencing commission were first introduced in the 95th Congress by Senators McClellan and Kennedy. Their bill, S. 1437, contained sentencing reform provisions and authorization of a sentencing commission to promulgate guidelines. S. 1437 passed the Senate on January 30, 1978 but was never passed by the House of Representatives.

This omnibus concept of sentencing reform, however, became the basis for subsequent legislation that would mark a new era in Federal criminal justice. The Comprehensive Crime Control Act of 1984, with sentencing reform provisions, was signed into law October 12, 1984. The Act established the United States Sentencing Commission as an independent agency in the judicial branch. Its purpose is to develop sentencing policies and practices for the Federal criminal justice system by promulgating guidelines which prescribe appropriate sentences for convicted Federal offenders. These guidelines, in turn, have the statutory purpose of furthering the objectives of sentencing: deterring criminals, incapacitating and/or rehabilitating the offender, and providing "just deserts" in punishing criminals.

*Sentencing under Guideline Provisions*

Guideline provisions change the sentencing process in two ways. First, the provisions themselves are, in fact, rules for courts to follow in imposing sentences. Prior to guidelines the sentencing decision was limited only by the maximum statutory penalty, leaving the sentencing judge with broad discretion in imposing a sentence. Second, and perhaps more important, under guidelines the decision-making process will be more explicit. Specific factors that the sentencing judge has weighed and considered according to guideline rules are to be stated on the record for review by the

courts of appeals and research by the Sentencing Commission. Objections and appeals will presumably be directed toward either the relevant facts the judge has considered or the rules selected and applied to the sentence. In most cases, every critical fact considered by the judge and the extent to which it influenced the sentence will be known by all parties at the imposition of the sentence.

A guideline sentence will most often be expressed as a range of months to be served. The U.S. Sentencing Commission has specified these ranges with a two-axis matrix or grid of sentencing options, the sentencing table (See table I).[3] The vertical axis is comprised of 43 offense levels, increasing in severity. The horizontal axis is comprised of six criminal history categories. If the sentencing court finds that a defendant with an offense level of 15, for example, has no prior record (Criminal History Category I) then a guideline sentence would likely be imposed within the range of 18 to 24 months. If a defendant with that same offense level, 15, were found by the court to have sufficient criminal history points to merit a Criminal History Category III, the appropriate range of the sentence—barring aggravating or mitigating factors—would be 24 to 30 months. Courts may depart from the guidelines if factors exist that were in the judgment of the court not adequately taken into account by the guidelines.

The presentence report has been changed to convey facts in support of guideline applications. Revised Rule 32 of the *Federal Criminal Rules of Procedure* establishes the required contents of the new presentence report. The presentence report is to contain the following information:

(A) information about the history and characteristics of the defendant, including his prior criminal record, if any, his financial condition, and any circumstances affecting his behavior that may be helpful in imposing sentence or in the correctional treatment of the defendant;

---

**3.** *U.S. Sentencing Commission Guidelines,* Sentencing Table, Chapter Five, Part A, page 5.2 U.S. Sentencing Commission, Washington, DC (October 1987).

(B) the classification of the offense and of the defendant under the categories established by the Sentencing Commission pursuant to section 994(a) of Title 28, that the probation officer believes to be applicable to the defendant's case; the kinds of sentence and the sentencing range suggested for such a category of offense committed by such a category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(1); and an explanation by the probation officer of any factors that may indicate that a sentence of a different kind or of a different length from one within the guidelines would be more appropriate under all the circumstances;

(C) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2);

(D) verified information stated in a non-argumentative style containing an assessment of the financial, social, psychological, and medical impact upon and cost to, any individual against whom the offense has been committed;

(E) unless the court orders otherwise, information concerning the nature and extent of nonprison programs and resources available for the defendant; and

(F) such other information as may be required by the court.

The most important facts in the report, those which have the greatest impact upon the number of months to be served, consist of facts in three sections of the report: the Offense Conduct, the Criminal History, and Offender Characteristics. The report must set out these verified facts in a concise manner and in such a way that judges may rely upon them as findings at the sentencing hearing. Factual or rule-related issues that are not resolved prior to the submission of the report will be conveyed to the court in an addendum. The addendum's purpose is to certify that the report, with revisions, has been disclosed to the defendant, his attorney, and the counsel for the Government, and that the content of the addendum has been communicated to counsel. Equally important, the addendum states the objections any party has made.

This will alert the judge to the potential issues likely to be raised at the sentencing hearing.

Information gathering and verification are traditional tasks performed by probation officers. Under guidelines, however, the probation officer must present the sentencing facts and rules to the court as he or she views them. This will entail weighing the evidence and resolving disputes to the extent that facts are not distorted. It is here that the investigative role of the probation officer takes on important new dimensions.

### An Array of New Skills

The guideline sentencing process requires the probation officer to learn and apply several new skills. The nature of the revised presentence report as a technical and largely legal document means the investigating officer must use extra care in verifying and specifying certain information. Beyond fact-gathering skills, however, guidelines require the probation officer to evaluate the evidence in support of facts, resolve disputes between the prosecutor and defense attorney, and testify, if necessary to present evidence in support of selected guideline applications. Officers must develop systematic procedures for keeping both their guideline manuals and their application skills up-to-date to ensure consistency in guideline applications. Each of these skills adds an important dimension to the work of the probation officer. What follows is a brief discussion of how they might affect the officer's role and function.

### Evaluating Factual Material

The probation officer has traditionally served the court as an independent investigator. In presentence investigation, prior to guidelines, the tasks of interviewing the defendant, the U.S. attorney, victims, and other parties demanded objectivity and accuracy. Reporting that information to the court, however, under "old law" presentence procedures did not require the officer to make independent judgments in the body of the report regarding which sets of facts

by various observers the court should rely upon in imposing sentence. In such cases if the probation officer was aware of conflicting information, heretofore, the officer presented opposing views so the court could consider them. The offense section of the "old law" report provides the best example of this. Here the probation officer was expected to impartially depict the defendant's and the Government's versions of the offense and include both versions in sequential sections of the report without much evaluative comment.

As is now widely known, guidelines sentencing requires the probation officer to gather similar information, weigh the evidence in support of divergent accounts, if they exist, and arrive at a single version of the offense. The same weighing of evidence and exercise of judgment is also required in other sections of the guideline-based report. Particularly in calculating guidelines for the offender and offense classifications, the probation officer must decide and recommend to the court the facts which are best supported by the available evidence.

### Resolving Disputes

Because critical judgments will be made regarding which facts the court should rely upon in sentencing, it is foreseeable that there will be disputes between the opposing parties. Resolving such disputes in a way so as to produce a balanced, fair, and yet timely report is another important skill probation officers will develop over time. In essence, what the investigating officer must attempt to do at this stage is narrow or eliminate the disputed issues, thereby simplifying the fact-finding process for the court. This phase of investigative work by the officer may have two stages. The first stage might be characterized by communication from the attorneys, both verbal and written, regarding any factual or guideline issues in question. In this communication phase the officer's impartiality and openness to opposing points of view become key to the dispute resolving process.

On points about which there is no disagreement, discussions about facts and ap-

plications may be brief. On those issues in dispute, however, the officer will request all documentation, argumentation, or other supportive evidence the attorneys may wish to submit. Asking questions, explaining guidelines implications, and encouraging the attorneys to consider all the available facts will typify the officer's role in these discussions. Simply stated, the goal of this process is to surface the maximum amount of evidence in support of opposing views, so that the officer's subsequent evaluative judgments can be made.

If what has been disclosed thus far by the attorneys does not require reinvestigation, the second stage of dispute resolution should ensue. This might be envisioned as the officer's opportunity to present his or her tentative guideline application, with a tentative statement of unresolved issues as they will appear in the addendum to the presentence report. The officer will make clear the evidence on which these recommended findings are based, detailing those matters that remain to be decided by the court. This may prompt another round of argumentation, or it may be the conclusion of the dispute resolving process. In either case it is imperative that the officer not be intimidated by the prospect of a challenge to the presentence report.

Predictably the defense attorney and the prosecutor will first vigorously argue, then seek to negotiate, disputed issues. The probation officer's function, however, is not one of negotiation. Rather, the officer's primary task is to assure that all reliable, relevant information is given to the court. Throughout the dispute resolution phase, the skills or qualities required of the officer are objectivity and willingness to listen. As noted in the publication, *Presentence Investigation Reports Under the Sentencing Reform Act of 1984*, ". . . it is crucial that probation officers continue to exercise their traditional independence as agents to the court." With regard to the probation officer's role in disputes, the publication states, "While the probation officer may discuss the case with the lawyers, it is not intended that the officer withhold from the court reliable information disclosed by his or her investigation. In particular, it is not

contemplated that the lawyers will, by agreement, be permitted to eliminate relevant information."

### Testifying in Court

Probation officers are long accustomed to providing testimony in probation violation hearings and parole revocation proceedings. Guideline sentencing procedures are expected to add testifying and witness skills to the probation officer's function in the presentence investigation. How frequently such testimony will be required, however, is difficult to estimate. Courts have discretion even under guidelines to make findings without an evidentiary hearing if the appropriate standard has been met, and the court is satisfied that a correct application of the guidelines can be made. Other important factors not yet known include how many disputed factual and guideline issues are likely to arise in the average investigation and how many may be settled prior to the submission of the presentence report.

Whether testimony regarding the presentence report emerges as a major aspect of the investigative job or not, the officer will be expected to have the necessary basic skills. To be an effective witness, an officer must be thoroughly prepared to answer questions about both the factual and rule-related findings recommended in the report. An evidentiary hearing of this kind could require the officer to produce statements of victims, collateral investigations performed by another probation officer, court judgments and related documents from other jurisdictions, or laboratory reports showing amounts and purity of drugs.

Bringing the appropriate documents to court is not, on the other hand, likely to completely allay the newer officer's anxiety about testifying; there is a need to be mentally prepared as well. Officers should seek the assistance of supervisors or experienced colleagues in studying the key issues in a given investigation. Perhaps even staging some "rehearsals" would be of value in training the officer to effectively present evidence under cross-examina-

tion. Along with these preparatory measures, officers will find direction by recalling their single most important objective: To remain independent and unbiased in the adversarial process and to provide the court with thoroughly verified information.

### Applying the Guidelines Consistently

This skill area is in many ways the foundation upon which all the other investigative skills rest. Without guideline application skills that are consistent, current, and complete, even the most industrious probation officer is going to find evaluating facts, resolving disputes, and testifying in court to be extremely burdensome and time-consuming. Obtaining this kind of consistency in guideline application, system-wide, is one of the major responsibilities facing the probation system.

The first step an individual officer can take in obtaining and maintaining consistency centers upon the basic "tool" of the job itself, the U.S. Sentencing Commission Guideline Manual. This manual, in order to be fully functional, needs to be properly posted in its binder with all commentary and appendices included. Should "emergency" amendments be promulgated, they should be clipped into the appropriate place to supplement the existing pages. The "emergency" amendments must then be followed pending congressional action which could review and affirm or repeal them. It may eventually be necessary for probation officers to maintain a steadily growing library of guidelines spanning developments over time.

Even though equipped with an up-to-date manual, the probation officer must be alert to other possible sources of inconsistency. Short-cuts and memorizing frequently used portions of the guidelines can cause errors. Adopting the habit of merely asking colleagues and relying upon "word of mouth" interpretations instead of directly consulting the appropriate guidelines will lead to inconsistency over time.

Of course, probation officers need not wage this campaign for consistency alone. Management initiatives on consistency of guideline application for quality control will

complement the line officer's efforts. For example, chief probation officers and supervisors in certain districts have already developed screening committees to review guideline reports. Specialized investigation units, where practicable, tend to bring consistency and reduce errors in procedures. Local training in guidelines application will no doubt continue to be a valuable experience for all participants.

The point cannot be overstated, even in light of the previous discussion, that accuracy in the use of the guidelines will set the level of credibility associated with the revised presentence report and reflect upon the officers who prepare them. As was true before guidelines, sentencing judges and magistrates will rely upon the probation officer's services to the extent that such service is viewed as genuinely valuable in selecting the most appropriate sentence in each case. Thus, the new role of the probation officer, although somewhat determined by guideline requirements, will ultimately be defined by the judges and probation officers most directly involved in the sentencing process.

## SENTENCING GUIDELINES
### TABLE 1. SENTENCING TABLE

*Criminal History Category*

| Offense Level | I<br>0 or 1 | II<br>2 or 3 | III<br>4, 5, 6 | IV<br>7, 8, 9 | V<br>10, 11, 12 | VI<br>13 or more |
|---|---|---|---|---|---|---|
| 1 | 0- 1 | 0- 2 | 0- 3 | 0- 4 | 0- 5 | 0- 6 |
| 2 | 0- 2 | 0- 3 | 0- 4 | 0- 5 | 0- 6 | 1- 7 |
| 3 | 0- 3 | 0- 4 | 0- 5 | 0- 6 | 2- 8 | 3- 9 |
| 4 | 0- 4 | 0- 5 | 0- 6 | 2- 8 | 4- 10 | 6- 12 |
| 5 | 0- 5 | 0- 6 | 1- 7 | 4- 10 | 6- 12 | 9- 15 |
| 6 | 0- 6 | 1- 7 | 2- 8 | 6- 12 | 9- 15 | 12- 18 |
| 7 | 1- 7 | 2- 8 | 4- 10 | 8- 14 | 12- 18 | 15- 21 |
| 8 | 2- 8 | 4- 10 | 6- 12 | 10- 16 | 15- 21 | 18- 24 |
| 9 | 4- 10 | 6- 12 | 8- 14 | 12- 18 | 18- 24 | 21- 27 |
| 10 | 6- 12 | 8- 14 | 10- 16 | 15- 21 | 21- 27 | 24- 30 |
| 11 | 8- 14 | 10- 16 | 12- 18 | 18- 24 | 24- 30 | 27- 33 |
| 12 | 10- 16 | 12- 18 | 15- 21 | 21- 27 | 27- 33 | 30- 37 |
| 13 | 12- 18 | 15- 21 | 18- 24 | 24- 30 | 30- 37 | 33- 41 |
| 14 | 15- 21 | 18- 24 | 21- 27 | 27- 33 | 33- 41 | 37- 46 |
| 15 | 15- 24 | 21- 27 | 24- 30 | 30- 37 | 37- 46 | 41- 51 |
| 16 | 21- 27 | 24- 30 | 27- 33 | 33- 41 | 41- 51 | 46- 57 |
| 17 | 24- 30 | 27- 33 | 30- 37 | 37- 46 | 46- 57 | 51- 63 |
| 18 | 27- 33 | 30- 37 | 33- 41 | 41- 51 | 51- 63 | 57- 71 |
| 19 | 30- 37 | 33- 41 | 37- 46 | 46- 57 | 57- 71 | 63- 78 |
| 20 | 33- 41 | 37- 46 | 41- 51 | 51- 63 | 63- 78 | 70- 87 |
| 21 | 37- 46 | 41- 51 | 46- 57 | 57- 71 | 70- 87 | 77- 96 |
| 22 | 41- 51 | 46- 57 | 51- 63 | 63- 78 | 77- 96 | 84-105 |
| 23 | 46- 57 | 51- 63 | 57- 71 | 70- 87 | 84-105 | 92-115 |
| 24 | 51- 63 | 57- 71 | 63- 78 | 77- 96 | 92-115 | 100-125 |
| 25 | 57- 71 | 63- 78 | 70- 87 | 84-105 | 100-125 | 110-137 |
| 26 | 63- 78 | 70- 87 | 78- 97 | 92-115 | 110-137 | 120-150 |
| 27 | 70- 87 | 78- 97 | 87-108 | 100-125 | 120-150 | 130-162 |
| 28 | 78- 97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |

| Offense Level | I<br>0 or 1 | II<br>2 or 3 | III<br>4, 5, 6 | IV<br>7, 8, 9 | V<br>10, 11, 12 | VI<br>13 or more |
|---|---|---|---|---|---|---|
| 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| 43 | life | life | life | life | life | life |